UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

DOO NAM YANG,                        :
                                   :

                Plaintiff,       :

                                   :   04-CV-8987 (LBS)

        - against -        :

                                   :   ECF

ACBL CORP., GOLD LEE JEWELRY CO.,   :
and HAN SUNG LEE,              :
                                 :

              Defendants.     :

                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW


**Steven Choi (SC1906)**
**Kenneth Kimerling (KK5762)**
**ASIAN AMERICAN LEGAL DEFENSE**
**AND EDUCATION FUND**
**99 Hudson Street**
**New York, New York 10013**
**212-966-5932**
**Attorneys for Plaintiff**

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS……………………………………………….......i

TABLE OF AUTHORITIES…………………………………………...iii

**Preliminary Statement**…………………………………………………1

**SUMMARY STATEMENT OF THE CASE**……………………………..1

I.   **PLAINTIFF'S RECOLLECTION OF HIS WAGES AND HOURS IS REASONABLE AND JUST**……………………………………………5

    A.   <u>**DEFENDANTS VIOLATED FEDERAL AND NEW YORK STATE LAW, FAILED TO KEEP RECORDS**</u>……………………………5

    B.   <u>**PLAINTIFF'S RECOLLECTIONS OF HIS WAGES AND HOURS ARE PRESUMPTIVELY CORRECT**</u>………………………………………...6

        1.   **Plaintiff Can Meet His Burden under Mt. Clemens with His Recollections**……..……………………………...………………..6

        2.   **Plaintiff's Recollections of His Wages and Hours**……………………..7

    C.   <u>**PLAINTIFF'S WEEKLY SALARY COVERED ONLY 50 HOURS OF WORK AT STRAIGHT TIME, AND HE RECEIVED NO OVERTIME PAY**</u>……………………………………………………………...9

        1.   **Defendants Have Burden of Showing "Explicit Agreement," "Careful Recording of Hours"**……………………………………10

        2.   **Defendants Offer No Evidence of an Explicit Agreement Regarding Overtime nor a Careful Recording of Overtime Hours**…...………….11

        3.   **Plaintiff Should Receive an Overtime Premium For His Normal Overtime Hours, and Full Overtime Wages For His Holiday Overtime Hours**……………………………………………12

    **CONCLUSION**……..………………………………………………13

II.   **DEFENDANTS CANNOT MEET THEIR BURDEN OF SHOWING PLAINTIFF'S RECOLLECTIONS TO BE UNREASONABLE OR NOT CREDIBLE**…………………………………………………………15

    **A.**   **<u>DEFENDANTS' EXCUSE FOR THEIR ABSENCE OF RECORDS IS FALSE AND INSUFFICIENT</u>**…………………………………………16

    B.   **<u>DEFENDANT'S EXHIBIT A SHOULD BE RULED INADMISSIBLE, AND A NEGATIVE INFERENCE SHOULD BE IMPOSED AGAINST DEFENDANTS</u>**………………………………………………..17

        1.  **Defendants' Exhibit A Is Inadmissible Hearsay**…………………...17

        2.  **Defendants Are Guilty of Spoliation of Plaintiff's Original Work Records, to the Extent that Such Work Records Existed**…….19

    **C.**   **<u>DEFENDANTS' FACTUAL ASSERTIONS ARE CONTRADICTORY, NOT CREDIBLE, AND DO NOT MEET THEIR BURDEN</u>**...…………22

        1.  **Defendant's Assertions Regarding Plaintiff Yang's Hours Is Contradictory and Imprecise.**………………………………………22

        2.  **Defendants' Contentions Regarding Plaintiff's Wages Are Also Imprecise and Conflicting.**………………….......................24

        **CONCLUSION**………………………………………………………25

III.  **PLAINTIFF IS ENTITLED TO SPREAD-OF-HOURS WAGES FOR EVERY DAY HE WORKED MORE THAN 10 HOURS**………………………….27

IV.  **DEFENDANTS HAVE COMMITTED CONVERSION REGARDING PLAINTIFF'S WAGES**……………………………………………………30

V.  **DEFENDANT HAN SUNG LEE IS AN EMPLOYER AND JOINTLY AND INDIVIDUALLY LIABLE FOR PLAINTIFF'S UNPAID WAGES**…………33

VI.  **DEFENDANTS' VIOLATIONS OF WAGE AND HOUR LAWS WERE INTENTIONAL**………………………………………………………34

    A.   **<u>A THREE-YEAR STATUTE OF LIMITATIONS IS APPLICABLE UNDER THE FLSA</u>**…………………………………………………..34

    B.   **<u>PLAINTIFF YANG IS ENTITLED TO FEDERAL AND STATE LIQUIDATED DAMAGES</u>**…………………………………………..35

**<u>APPENDIX 1</u>: PLAINTIFF'S ESTIMATE OF DAMAGES**...………........Appendix 1

**<u>APPENDIX 2</u>: CALCULATION OF YEARS OF INTEREST**……...…...Appendix 11

# TABLE OF AUTHORITIES

**Cases**

Airlines Reporting Corp. v. Aero Voyagers, Inc.,
721 F. Supp. 579 (S.D.N.Y. 1989)……………………………………………………32

Alvarez v. IBP, Inc., 339 F.3d 894 (9th Cir. 2003)……………………………………34

AMF Inc. v. Algo Distributors, Ltd., 40 A.D.2d 352, 369 N.Y.S.2d 460 (2d
Dept.1975)………..……………………………………………………………………30

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946)………………………6, *passim.*

Ayres v. 127 Restaurant Corp., 12 F. Supp. 2d 305 (S.D.N.Y. 1998)………………….. 36

Barsoum v. N.Y. City Hous. Auth., 202 F.R.D. 396 (S.D.N.Y. 2001)…………………. 20

Bauin v. Feinburg, 6 Misc.3d 1038, 800 N.Y.S.2d 342 (N.Y. Civ. 2005)……….……….28

Brock v. Wilamowsky, 833 F.2d 11 (2d Cir. 1987)……………………………………... 35

Byrnie v. Town of Cromwell Bd. Of Educ., 243 F.3d 93 (2d Cir. 2001)…………… 20, 21

Chen v. St. Beat Sportswear, Inc., 364 F. Supp. 2d 269 (S.D.N.Y. 2005)……………… 27

D'Amico v. First Union Nat. Bank, 285 A.D.2d 166, 728 N.Y.S.2d 146
(1st Dept. 2001)……………………………………………………………….… 31

Donovan v. Kentwood Dev. Co., Inc., 549 F. Supp. 480 (D. Md. 1982)………………… 7

Fiorenti v. Central Emergency Physicians, P.L.L.C., 187 Misc.2d 805, 723 N.Y.S.2d 851
(N.Y. Sup. 2001)……………………………………………………………..………..30

Giles v. City of New York, 41 F. Supp. 2d 308 (S.D.N.Y. 1999)………………………. 10

Hardrick v. Airway Frights Systems, Inc., 63 F. Supp. 2d 898 (N.D. Ill. 1999)………... 34

Heng Chan v. Triple 8 Palace, 2005 U.S. Dist. LEXIS 16520 (S.D.N.Y. 2005)……….. 20

Herman v. RSR Sec. Servs., 172 F.3d 132 (2d Cir.1999)………..…………………..33, 34

Hodgson v. Humphries, 454 F.2d 1279 (10th Cir. 1972)…………………………………. 7

I.H.P. Corp. v. 210 Cent. Park South Corp., 16 A.D.2d 461, 228 N.Y.S.2d 883 (1st Dept.
1962)……………………………………………………………..……………. 32

Jacobsen v. Stop & Shop Supermarket Co., 2003 U.S. Dist. LEXIS 7988 (S.D.N.Y. 2003)……………………………………………………………..……….10

Key Bank of New York v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403 (3d Dept. 1996)…………………………………………………………………………...30

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998)……………………………..19, 20

Manekas v. Allied Discount Co., 6 Misc.2d 1079, 166 N.Y.S.2d 366 (N.Y.Sup. 1956)…………………………………………………………………32

Marshall v. R & M Erectors, Inc., 429 F. Supp. 771 (D. Del. 1977)……………………11

McLaughlin v. Richland Shoe Co., 286 U.S. 128 (1988)………………………………..34

Moon v. Kwon, 248 F. Supp. 2d 201 (S.D.N.Y. 2002)………………………... 10, *passim.*

Mumbower v. Callicott, 526 F.2d 1183 (8th Cir. 1975)………………………………..7

New York City Transit Authority v. New-York Historical Society, 176 Misc.2d 31, 635 N.Y.S.2d 998 (N.Y. Sup. 1995)………………………………….. 31

Nunn's Battery & Electric Co. v. Goldberg, 298 F.2d 516 (5th Cir. 1962)………….10, 12

Palmer v. Hoffman, 318 U.S. 109 (1943)………………………………………………...18

Reich v. Southern New Eng. Telecomm.Corp., 121 F.3d 58 (2d Cir. 1997)……………………………………………...28, 29, 35, 37

Reilly v. NatWest Market Group, Inc., 181 F.3d 253 (2d Cir. 1999)……………………37

Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002)…………………………………………………….. 19, 20, 21, 22

Rogers v. City of Troy, 148 F.3d 52 (2d Cir. 1998)……………………………………...35

Smith v. City of New York, 2005 U.S. Dist. LEXIS 231 (S.D.N.Y. 2005)…………….. 20

Topo v. Dhir, 2004 U.S. Dist. LEXIS 4134 (S.D.N.Y. 2004)…………………………...27

Turner v. Hudson Transit Lines, 142 F.R.D. 68 (S.D.N.Y. 1991)……………………… 20

Turner v. Human Genome Sciences, Inc., 292 F. Supp. 2d 738 (D. Md. 2003)………….7

Velez v. Majik Cleaning Serv., 2005 U.S. Dist. LEXIS 709 (S.D.N.Y. 2005)………… 27

Walton v. United Consumers Club, Inc., 786 F.2d 303 (7th Cir. 1986)....................35

Wirtz v. Leon's Auto Parts Co., 406 F.2d 1250 (5th Cir. 1962).............................10

Wirtz v. Mississippi Publishers Corp., 364 F.2d 603 (5th Cir. 1966).......................14

Zeng Liu v. Jen Chu Fashion Corp., 2004 U.S. Dist. LEXIS 35 (S.D.N.Y. 2004).........28

**Statutes and Regulations**

29 U.S.C. § 203(d)..............................................................................33

29 U.S.C. § 207(a)(1)..........................................................................9

29 U.S.C. § 211(c)..............................................................................5

29 U.S.C. § 216(b).........................................................................35, 37

29 U.S.C. § 255(a)............................................................................34

29 U.S.C. § 260................................................................................35

N.Y. C.P.L.R. 5001...........................................................................37

N.Y. Lab. § 2(6)..............................................................................33

N.Y. Lab. § 193...............................................................................32

N.Y. Lab. § 196-a........................................................................ 7, 15, 27

N.Y. Lab. § 198(1-a)....................................................................32, 36, 37

N.Y. Lab. § 663(1)...................................................................... 36, 37

29 C.F.R. § 516(b)(4).........................................................................11

29 C.F.R. § 516.2.............................................................................5

29 C.F.R. § 516.5.............................................................................5

29 C.F.R. § 778.108..........................................................................8

29 C.F.R. § 778.109..........................................................................8

29 C.F.R. § 778.113..........................................................................8

29 C.F.R. § 778.325…………………………………………………………………12

12 N.Y.C.R.R. § 142-2.2………………………………………………………… 9

12 N.Y.C.R.R. § 142-2.4…………………………………………………………27

12 N.Y.C.R.R. § 142-2.6………………………………………………………… 5

12 N.Y.C.R.R. § 142-2.7……………………………………………………6, 16

Fed. R. Evid. 801…………………………………………………………………18

Fed. R. Evid. 802…………………………………………………………………18

Fed. R. Evid. 803(6)…………………………………………………………….. 18

Fed. R. Evid. 804…………………………………………………………………18

## Preliminary Statement

This pre-trial brief is broken down into several parts.  In the first section, Plaintiff Yang provides a summary statement of the issues to be resolved at trial without citation to the law or established facts.  The following sections of the brief then discuss these points in greater detail with full citations to the law, deposition testimony, and exhibits.[1]  At the end of the brief, Plaintiff will set forth a calculation of damages based on his anticipated testimony.

## SUMMARY STATEMENT OF THE CASE

Plaintiff Doo Nam Yang was a factory worker making jewelry for defendants ACBL Corp. and Gold Lee Jewelry Co. from October 1997 until February 2004, including some periods where he worked elsewhere.  Defendants are manufacturers of jewelry and are engaged in interstate commerce.  Defendant Han Sung Lee was the owner and manager of these corporate defendants.  As a corporate owner, ACBL replaced Gold Lee sometime in 2000, but the factory went on unchanged with the same workers and supervisors.

The main issue in this trial is whether Plaintiff Yang was paid his proper overtime wages.  Both state and Federal law require that an employee be paid one-and-a-half times his regular hourly rate of pay for all hours worked over 40 hours a week.  Plaintiff maintains and will demonstrate at trial that he worked more than 50 hours a week on most weeks during the year.  In addition, Plaintiff will testify that during the approximate month leading up to the Christmas holiday, he often worked seven days a week and substantially longer hours, adding up to more than 90 hours per week.  Plaintiff thus worked overtime hours in his regular workweeks, significant overtime during the holiday season, and more than 10 hours per day almost every

---

[1] Because Plaintiff was never deposed, discussion of his testimony will be based on his anticipated testimony at trial.

day.  Yet Plaintiff was paid a flat salary each week, an amount that did not include overtime wages.

Plaintiff's demonstration of these overtime violations would be simple if Defendants had followed their statutory duties under Federal and state law.  Defendants were required to keep a written employment agreement or a record of an oral contract, as well as complete records of his hours, wages, overtime wages, and deductions.  They were also required by state law to provide him with detailed payment slips with his wages that included a breakdown of his daily and weekly hours, pay, and overtime pay.  None of these records exist, however.  In such circumstances, precedent requires that this Court treat Plaintiff's recollections of his hours and wages as presumptively correct, and also that his flat weekly salary presumptively did not include overtime wages.  This Court should then place the burden on defendants to show the exact number of hours that Plaintiff worked and the wages he received.

Defendants are unable to sustain their burden.  They offer multiple defenses.  They assert that the absence of records of Plaintiff's hours and wages was the result of a flood that destroyed their records.  This assertion is false and moreover, is insufficient on its face.  The flood cannot have destroyed the wage and hour statements that defendants were required to provide to Plaintiff with his pay.  Moreover, the flood took place about six weeks before the termination of Plaintiff's employment, yet no records exist for the post-flood period for either Plaintiff or his coworkers.  In fact, Defendants rarely maintained any records of Plaintiff's hours and those were destroyed by Defendants well before the flood.

Defendants have also attempted to provide evidence of Plaintiff's hours and wages by producing a document that they assert is based on the destroyed documents.  This document is inadmissible hearsay as it was not kept in the ordinary course of business, but was prepared

specifically to rebut Plaintiff's lawsuit for overtime.  If the document was indeed prepared from "destroyed records" – and Plaintiff disputes that such records existed – Defendants' failure to make copies, preserve, or produce these original records makes them guilty of spoliation.

In addition, the discrepancies between the purported record and Defendants' factual assertions raise serious questions about Defendants' credibility.  For example, Defendant Lee asserts that Plaintiff was paid for his 45 hours of work in his regular workweek.  The record, however, reflects only 40 hours of pay for Plaintiff's workweek.  Defendants' manager, Mr. Hyung Park, also testified that his 12 hours of overtime was the maximum any of Defendants' employees worked.  Yet the record claims that Plaintiff worked up to 32 hours of overtime in a single week.  Defendant Lee also testified that Plaintiff Yang worked at most one or two weeks of holiday-season overtime a year, but the record shows Plaintiff to be working five to six weeks of holiday-season overtime every year.  Given these contradictions, none of these sources can be found credible, and none can show that Plaintiff's recollections are unreasonable or incredible.

Indeed, Defendants' misdeeds extend to more than simply overtime violations.  Plaintiff will show that he was not paid proper spread-of-hours wages, as Defendants offer no evidence of any precision to rebut his recollections that he worked more than 10 hours almost every day. Plaintiff will also show that after he asked Defendants to put him on the official payroll and pay the required employment taxes on his behalf, Defendants instead illegally converted deductions from his paychecks and failed to pay such taxes.

Plaintiff will also demonstrate that Defendant Lee is Plaintiff's employer.  Defendant Lee had sole control over the corporate Defendants.  Since he possessed the powers of an employer as defined by Federal and state law, he is thus jointly liable for Plaintiff's claims.  Plaintiff will also show that Defendants' violations were willful and intentional, and a three-year statute of

limitations for his Federal claims and Federal and state liquidated damages should be applied.

At the conclusion of this trial, this Court will find that Plaintiff's claims are accurate and valid.  Plaintiff seeks $67,312.44 in unpaid wages, conversion damages, and additional statutory liquidated damages, plus pre-judgment interest of $9,613.05, plus attorney's fees and costs.  The calculation of these damages is set forth at the end of this brief in Appendix 1.

## POINT I

## PLAINTIFF'S RECOLLECTION OF HIS WAGES AND HOURS IS REASONABLE AND JUST

Plaintiff Yang has alleged that Defendants violated Federal and New York State labor laws by not paying him overtime and spread-of-hours wages, as well as illegally converting deductions from his wages.  Plaintiff would easily be able to demonstrate these violations if Defendants had adhered to Federal and state law and kept complete records of his hours and wages, or had provided Plaintiff with the detailed payment slips as New York State law requires.

None of these records exist, however.  In cases such as this, precedent clearly requires that this Court treat Plaintiff's recollections of his hours and wages as presumptively correct. This Court should find that Plaintiff Yang was paid a flat salary intended to compensate him for 50 hours per week, but that this flat salary did not include overtime either for the 12.5 hours of overtime he regularly worked, nor the 51 hours of overtime he worked during the holiday periods.

### A.  DEFENDANTS VIOLATED FEDERAL AND NEW YORK STATE LAW, FAILED TO KEEP RECORDS

Defendants, as Plaintiff Yang's employers, were required by Federal and New York State law to maintain detailed records of Plaintiff's wages and hours of work.   The FLSA emphasizes that employers must "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c).  These records must be specific and detailed.  Employers must keep records of: (1) the total daily and weekly work hours; (2) regular hourly rates of pay for each week that overtime is worked; (3) total daily or weekly earnings; (4) total wages paid; and (5) total weekly premium pay for overtime hours.  See 29 C.F.R. §§ 516.2, 516.5; 12 N.Y.C.R.R. § 142-2.6.

Furthermore, New York State law imposes a requirement that employers give records to

their employees as well.  With every payment of wages, employers must also include a statement of "hours worked, rates paid, gross wages, allowances, if any, claimed as part of the minimum wage, deductions and net wages."  12 N.Y.C.R.R. § 142-2.7.

Plaintiff will prove at trial that Defendants violated Federal and state law by failing to keep these detailed work records, and by failing to provide him with detailed payment slips.  The bare fact is that no records of Plaintiff Yang's employment currently exist.  Defendants have not offered any contemporaneously-made records as exhibits at trial.[2]  Defendants also cannot claim that they provided Plaintiff Yang with the detailed payment slips required by New York law.  This failure by Defendants to keep any records for Plaintiff Yang makes it difficult for him to show the full and precise extent of Defendants' violations of overtime and spread-of-hours.

## B. PLAINTIFF'S RECOLLECTIONS OF HIS WAGES AND HOURS ARE PRESUMPTIVELY CORRECT

### 1. Plaintiff Can Meet His Burden under Mt. Clemens with his Recollections

When an employer has not maintained accurate wage and hour records, the Supreme Court has laid out a clear allocation of relative burdens of proof on the employer and the employee.  See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946).  In Mt. Clemens, the Court recognized that an employee is in a particularly difficult position when an employer fails to keep records in compliance with its legal duties:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records.  But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it

---

[2] Defendants instead offer an exhibit which they allege to be a summary of Plaintiff Yang's "reprepared" records.   The admissibility and reliability of this document are analyzed below in Parts II.A and II.B.

would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

Id. at 687-688.  New York incorporates a similar standard in its statutes.  N.Y. Lab. § 196-a.[3]

Under Mt. Clemens, then, Plaintiff Yang can make a prima facie case by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  Id.  It is well-settled law that an employee can meet this burden with his recollections of his hours and wages.  See e.g., Mumbower v. Callicott, 526 F.2d 1183, 1187 (8th Cir. 1975) (relying on an employee's recollections was proper; otherwise employer could "benefit from their failure" to maintain records); Turner v. Human Genome Sciences, Inc., 292 F. Supp. 2d 738, 748 (D. Md. 2003) ("A prima facie case can be made through an employee's testimony giving his recollection of hours worked") (quoting Donovan v. Kentwood Dev. Co., Inc., 549 F.Supp.480, 485 (D. Md. 1982); Hodgson v. Humphries, 454 F.2d 1279, 1283 (10th Cir. 1972) ("The testimony of the former employees, standing alone, made out the . . . prima facie case").

**2.  Plaintiff's Recollections of his Wages and Hours**

Plaintiff Yang was paid a flat weekly sum every week that rose gradually over time. Plaintiff will testify that he was paid by Defendants as follows[4]:

A.  October 1997 (beginning of employment) to January 1998 : $200 per week

---

[3] "In such a case [of a failure to maintain accurate records] the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements."  N.Y. Lab. §196-a.

[4] A detailed breakdown of Plaintiff Yang's wages is included in Plaintiff's Proposed Findings of Fact and Conclusions of Law.

      B. July 1999 to February 2000: $350 per week
      C. February 2000 to October 2000 : $400 per week
      D. October 2000 to February 2001 : $450 per week
      E. February 2001 through October 2001 : $500 per week
      F. November 2001 through March 2002 : $550 per week
      G. April 2002 through February 2004 (end of employment): $600 per week

This flat weekly salary must then be converted into an hourly rate of pay.  In order to calculate a rate of pay for overtime hours, an employee's "regular rate of pay" must first be determined the "amount of wages and the mode of payment" to the employee.  29 C.F.R. § 778.108.  In cases when the "mode of payment" is a weekly salary, as is the case here, the rate of pay is then calculated by dividing this weekly salary by the number of hours the salary was "intended to compensate."  29 C.F.R. § 778.113.  The result is an hourly "regular rate of pay" based on this salary and the intended hours.  29 C.F.R. § 778.109.

Plaintiff Yang maintains that his weekly salary was "intended to compensate" him for a weekly schedule of 50 hours per week. 29 C.F.R. § 778.113.  For the majority of the period Plaintiff Yang was employed by Defendants, he worked a fairly regular schedule.  Plaintiff recalls that at the beginning of his employment, Defendant Lee told him that his usual schedule would be from 9:00 a.m. to 7:00 p.m.  Plaintiff Yang will testify that his regular workday did indeed begin at 9:00 a.m., although he almost always[5] worked past 7:00 p.m.  Plaintiff Yang usually worked five days a week.[6]  Although Plaintiff Yang took a half-hour lunch break, the fact

---

[5] Plaintiff estimates that he stopped working at 7:00 p.m. for only three to five days each year; every other day he worked past 7:00 p.m., sometimes until 8:00 p.m.  He estimates that he worked on the average to 7:30 p.m. every evening when the intended end of the workday was 7:00 p.m.

[6] For various periods during his employment, Plaintiff also worked alternate Saturdays, from 9:00 a.m. to 5:00 p.m.  These periods are included in the detailed breakdown of his hours, wages, and damages in Appendix 1.

that Defendants treated this break as fully-paid work time[7] means that Plaintiff's flat weekly salary was intended to compensate him for a full 50 hours of work per week as a result. His "regular rate of pay" is then as follows:

A. October 1997 (beginning of employment) to January 1998 : $4.00 per hour
B. July 1999 to February 2000: $7.00 per hour
C. February 2000 to October 2000 : $8.00 per hour
D. October 2000 to February 2001 : $9.00 per hour
E. February 2001 through October 2001 : $10.00 per hour
F. November 2001 through March 2002 : $11.00 per hour
G. April 2002 through February 2004 (end of employment): $12.00 per hour

During the holiday period roughly between November 20th and December 22nd, however, Plaintiff Yang and the other workers at Gold Lee and ACBL worked substantially more than 50 hours per week. Plaintiff maintains that he worked seven days per week during these holiday periods, from 9:00 a.m. until 11:00 p.m. on weekdays and 9:00 a.m. to about 7:30 p.m. on weekends, for a total of 91 hours per week.

Plaintiff's flat weekly salary, however, did not increase while his hours nearly doubled. The FLSA and New York Labor Law requires that an employer compensate an employee at a rate of at least one and one-half times their "regular rate" of pay for every hour worked in excess of forty hours per workweek. See 29 U.S.C. § 207(a)(1), 12 N.Y.C.R.R. § 142-2.2. Despite working these significant amounts of overtime, Plaintiff will testify that he never received any overtime pay, in clear violation of Federal and state overtime provisions.

## C. PLAINTIFF'S WEEKLY SALARY COVERED ONLY 50 HOURS OF WORK AT STRAIGHT TIME, AND HE RECEIVED NO OVERTIME PAY

---

[7] It was Defendants' practice to include this lunch break as paid work time; Defendants' deposition testimony confirms this in their calculations of wages and hours without mention of this lunch break. See Lee Deposition, p. 93, ln. 12-15. Plaintiff will also testify that Defendant Lee never informed him that the lunch break was unpaid nor did he deduct such time from Plaintiff's wages. Any lunch breaks Plaintiff took will thus be counted as fully-paid work time. Any attempt by Defendants to subtract this lunch break after is simply an after-the-fact change in the Plaintiff's working conditions.

Plaintiff Yang contends that he was paid a flat weekly salary, and this weekly salary did not include overtime payments.  Defendants present no evidence about Plaintiff's weekly salary including overtime payments, let alone showing the "explicit agreement" as to overtime and the "careful practice of recording overtime hours" that is required.  Nunn's Battery & Electric Co. v. Goldberg, 298 F.2d 516, 519 (5th Cir. 1962).

1. **Defendants Have Burden of Showing "Explicit Agreement," "Careful Recording of Hours"**

When an employer does not keep the required records, an employee who receives a flat weekly salary is in a particularly difficult situation in demonstrating that the employer has not paid overtime.  Courts have recognized this difficulty and have presumed that the salary did not include overtime pay.  Moon v. Kwon, 248 F. Supp. 2d 201, 207 - 208 (S.D.N.Y 2002).[8]

Employers must meet a notably high standard to rebut this presumption.  Courts have ruled that if an employer claims a flat weekly salary included overtime, they must show "(1) an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime hours and (2) a careful practice of recording the hours worked overtime by each employee and paying him for them at the increased rate."  Nunn's Battery & Electric Co., 298 F.2d at 519; also see, e.g., Jacobsen v. Stop & Shop Supermarket Co., 2003 U.S. Dist. LEXIS 7988, 7 (S.D.N.Y. 2003) ("If an employer seeks to pay a non-exempt employee a weekly salary that includes a premium overtime component calculated at time and one-half of an hourly rate, there must be an express agreement to such an arrangement"); Wirtz v. Leon's Auto Parts Co., 406 F.2d 1250, 1252 (5th Cir. 1962) ("[An] indispensable factor[] for compliance with this

---

[8] In fact, the legal presumption is that a weekly salary only covers 40 hours. Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999).  Here it is conceded that the salary covered 50 hours of straight time pay.

statute ... [is] an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime."); <u>Marshall v. R & M Erectors, Inc.</u>, 429 F. Supp. 771, 780 (D. Del. 1977) (a "[f]ixed salary will not be deemed to include an overtime component in the absence of an express agreement.")

**2. Defendants Offer No Evidence of an Explicit Agreement Regarding Overtime Nor a Careful Recording of Overtime Hours**

Defendants offer no evidence of an "explicit" agreement as to overtime between Plaintiff Yang and Defendants; in fact, they offer no evidence of any agreement at all.  At the outset of employment, an employer is required to preserve the written contract or agreement with an employee, or if there is no written agreement the employer must reduce the terms of an oral agreement to writing.  <u>See</u> 29 C.F.R. § 516(b)(4).  Defendant Lee unquestionably violated this provision, claiming in his deposition that "I do not prepare employment contracts in general, but in [Plaintiff Yang's] case, since he was a trainee, it was definitely not necessary."  Lee Deposition, p. 67, ln. 2-4.

In regards to overtime, Defendant Lee admitted he did not recall whether he told Plaintiff what his overtime pay rate would be.  <u>See</u> Lee Deposition, p. 66, ln. 12-14.  Defendant Lee stated by way of explanation that "because overtime did not take place often or regularly with our company, that it was not necessary for me to mention overtime."  Lee Deposition p. 66, ln. 17-19.  Instead of an "explicit agreement" as to overtime, Defendants cannot even show there was a written agreement or record of an oral agreement, let alone show that there was an agreement as to overtime.

Defendants also cannot demonstrate the "careful practice of recording overtime hours" that is required.  As noted above, Defendants do not possess a single contemporaneously-made record that shows Plaintiff Yang's overtime hours and wages as required by Federal and New

11

York law, because no such records exist.  Defendants also have not offered into evidence a single detailed payment slip required by New York law, because no such slip exists as well.  Far from offering the "careful practice of recording hours" required by Nunn's Battery, Defendants currently do not possess any such records, in violation of Federal and New York State law.  Id. at 519.

3. **Plaintiff Should Receive An Overtime Premium for his Normal Overtime Hours, and Full Overtime Wages for his Holiday Overtime Hours.**

Defendants' failure to provide an explicit agreement or the careful recording of overtime hours means that this Court should find Plaintiff's flat weekly salary to not include overtime.  As a result, Plaintiff should receive an overtime premium on his 12.5 overtime hours worked regularly, and full overtime wages on any hours worked beyond this number of hours.

Federal law requires that when an employee's flat weekly salary is intended to cover more than 40 hours per week, an overtime premium of "half-time" (the difference between the overtime rate and the regular rate) should be applied to hours worked over 40 up to the intended number of hours, and full pay at the overtime rate should be awarded for any hours beyond the intended number.  See 29 C.F.R. § 778.325.  This Court's decision in Moon is instructive in this regard.  In Moon, a Korean maintenance worker in a hotel had a regular weekly schedule of 60 hours per week and testified that his salary was indeed intended to cover those 60 hours.  Id. at 208.  The Court thus calculated the plaintiff's "regular rate of pay" for that period as his weekly salary divided by the intended 60 hours per week.

The Court then concluded that since "defendants offer no evidence indicating that either party to the agreement understood Moon's weekly salary to include any such overtime premium," the plaintiff's weekly salary did not include overtime and awarded him the "half-time" overtime premium on the 20 overtime hours he worked per week.  Id. at 208-9.  However,

12

the plaintiff in <u>Moon</u> often worked many hours beyond 60 each week.  The Court found that the plaintiff had not been compensated at all for these hours over 60, and awarded him full wages at the overtime rate for those hours.  <u>Id.</u> at 234.

In the case at bar, Plaintiff maintains that his flat weekly salary was intended to cover 50 hours per week.  As in <u>Moon</u>, there is no evidence of any understanding that this included overtime.  Plaintiff's damages should thus be computed similarly – a "half-time" overtime premium should be applied to the hours Plaintiff worked over 40 per week, up to the intended 50 hours per week.  However, Plaintiff generally worked past 7:00 p.m. on non-holiday days; he estimates that he worked on average a half-hour past 7:00 p.m. every day.  Plaintiff thus actually worked an average of 52.5 hours per week.  His damages thus should not only include an overtime premium of 10 hours of pay at "half-time," but also 2.5 hours at a full overtime rate of time-and-a-half of his regular rate, because he has not been paid for these hours at all.

During the busy holiday periods, Plaintiff Yang maintains and will demonstrate that his average workweek spanned more than 90 hours per week, as noted above.  As in <u>Moon</u>, this Court should find that Plaintiff was not compensated at all for his considerable overtime work. For these holiday weeks, Plaintiff should thus receive damages for an overtime "half-time" premium for 10 hours, and then a full overtime rate of time-and-a-half of his regular rate for his substantial hours worked beyond the intended 50 hours per week.  A detailed breakdown of Plaintiff's owed overtime wages is attached as Appendix 1.

## CONCLUSION

This Court is given the responsibility by the Supreme Court in <u>Mt. Clemens</u> to determine the amount of hours that Plaintiff Yang worked, "even though the result be approximate." <u>Id</u>. at 688.  The incontrovertible fact is that the work records Defendant was required to keep do not

exist, and that Defendants failed to give Plaintiff the payment slips required by law.  Defendants'

failure to follow record-keeping requirements means that they cannot "complain that the

damages lack the exactness and precision of measurement that would be possible had [they] kept

records in accordance . . . with the Act."  <u>Mt. Clemens</u> at 688.  In <u>Moon</u>, 248 F. Supp. 2d at 201,

this Court emphasized that these requirements serve a crucial prophylactic purpose:

> [T]hese requirements are not mere technicalities, but substantive obligations that are
> "fundamental underpinnings" of FLSA and critical to ensuring the statute's effectiveness,
> for an employer's "failure to keep accurate records can obscure a multitude of minimum
> wage and overtime violations." (quoting <u>Wirtz v. Mississippi Publishers Corp.</u>, 364 F.2d
> 603, 607 (5th Cir. 1966).

<u>Id.</u> at 219.  Indeed, these record-keeping requirements are intended to prevent employers from

doing exactly what Defendants do here - arguing after the fact that they paid their employee

overtime correctly when an employee contends otherwise.

Because of Defendants' failings, this Court is compelled by <u>Mt. Clemens</u> to rely on

Plaintiff's evidence - his recollections of his wages and hours.  This Court should find Plaintiff's

recollections to be reasonable, more than sufficient to meet his burden under <u>Mt. Clemens</u> and

presumptively correct, and should award Plaintiff full damages accordingly.

**POINT II**

**DEFENDANTS CANNOT MEET THEIR BURDEN OF SHOWING PLAINTIFF'S
RECOLLECTIONS TO BE UNREASONABLE OR NOT CREDIBLE**

The Supreme Court in <u>Mt. Clemens</u> clearly delineated the burdens of employer and

employee.  Since Defendants have violated the record-keeping requirements of both Federal and

state law, Defendants must meet a bar set high by <u>Mt. Clemens</u>: "to come forward with evidence

of the precise amount of work performed or with evidence to negative the reasonableness of the

inference to be drawn from the employee's evidence." <u>Id.</u> at 688.  A similar burden is imposed

by New York State law.  <u>See</u> N.Y. Lab. § 196-a.  Defendants are not able to meet their burdens

of proof.

Defendants contend in their defense that Plaintiff Yang's work records do not exist

because of a flooding accident.  Defendants also claim that their exhibit described as "Weekly

Payroll Record for Doo Nam Yang during the intermittent periods of employment with

Defendants beginning July 1997 through January 2004" (hereinafter "Exhibit A"), is evidence

that Plaintiff was paid overtime properly.  They also offer various assertions in deposition

testimony that Plaintiff was paid properly as well.

A closer look at these defenses, however, reveals serious flaws, contradictions, and

unanswered questions.  These defenses contradict one another, raise the specter of spoliation, and

simply fall well short of meeting their legal burden of proof.  This Court should find

unequivocally that Defendants' failure to keep and preserve Plaintiff's work records is

unexcused, that Defendants' Exhibit A should be stricken from use at trial and a negative

inference imposed, and that ultimately Defendants' evidence lacks the precision, consistency,

and reasonableness required by <u>Mt. Clemens</u>.  Defendants' defenses simply do not meet their

burden of proof.

**A.  DEFENDANTS' EXCUSE FOR THEIR ABSENCE OF RECORDS IS FALSE AND INSUFFICIENT**

Defendants argue that they fulfilled (and continue to fulfill) their Federal and state duties by keeping detailed records of employees' wages and hours.  They contend that the absence of original work records is excused by a January 2004 flooding accident[9] that supposedly destroyed all of Defendants' documents.  See Lee Deposition p. 16, ln. 21-23.

Defendants' claims about this accident, however, do not answer why Defendants failed to provide Plaintiff Yang the required payment slips.  As noted earlier, Defendants were required to provide employees with a statement detailing "hours worked, rates paid, gross wages, allowances, if any, claimed as part of the minimum wage, deductions and net wages" along with their wages.  12 N.Y.C.R.R. § 142-2.7.  Defendants make no claim that they abided by these requirements, nor do they offer any evidence that they have done so.  Had they provided Plaintiff Yang with such slips, a record would have been preserved regardless of any flooding accident.

Furthermore, Defendants' claims about this flooding accident raise more questions than answers.  Plaintiff continued to work for Defendants for a full six weeks after the flooding accident.  Defendants offer no reason nor excuse, however, about why they failed to produce any work records for these six weeks of Plaintiff Yang's employment.  In addition, Defendant Lee claimed that timecards are still kept at ACBL, and that he took personal responsibility for maintaining employee work records after Plaintiff Yang's lawsuit was filed.  See Lee Deposition

---

[9] Defendants only offer photos, a letter from Defendants' landlord, and a letter from the insurance company (described as "[l]etters, reports and photographs pertaining to reports of flooding at Defendants' place of business") to detail the damage from this accident.  The insurance company letter, however, says nothing about any damage that may have occurred, only that Defendants made an *oral* request for insurance coverage in April 2005 - approximately 15 months after the accident occurred and well past the start of litigation, indeed after Plaintiff had served his First Set of Document Requests.  There is no mention of any specific damage in this insurance company letter, let alone a mention of damage specifically to employee records.

p. 58, ln. 23-24; p. 53 ln. 11-16.  Defendant Lee also claimed that after Plaintiff's case began, he gave receipts to those employees who received only cash wages.  <u>See</u> Lee Deposition, p. 86, ln. 9-10.

Defendants, however, have failed to produce any post-flood work records, for any period, for any of Plaintiff's coworkers, despite Plaintiff's explicit demand for them.  Defendants have offered no excuse as to why such documents are unavailable, despite Defendant Lee's personal responsibility for keeping these records.

 The truth is that Defendants kept time cards for Plaintiff Yang for only about a one-month period, and these documents were destroyed on a regular basis, well before any flooding accident.  Defendants' claims that they adhered to the Federal record-keeping requirements are spurious. This Court should find unequivocally that Defendants failed to keep the mandated records, and that this failure cannot be excused by any flooding accident.

**B.**  **<u>DEFENDANTS' EXHIBIT A SHOULD BE RULED INADMISSIBLE, AND A NEGATIVE INFERENCE SHOULD BE IMPOSED AGAINST DEFENDANTS</u>**

Defendants' only evidence of employment records - and their only evidence controverting Plaintiff's claims – is a document that purports to reflect Plaintiff's wages and hours, presumably based on original work records maintained by Defendant.  <u>See</u> Exhibit A. This document is clearly inadmissible hearsay and to the extent that any original documents existed, Defendants have committed spoliation.

1.  **Defendants' Exhibit A Is Inadmissible Hearsay**

Defendants claim that Exhibit A was created from original work records of Plaintiff's employment.  <u>See</u> Lee Deposition, p. 74, ln. 19-23; p. 76, ln. 7-11.  Defendants contend that these original work records were salvaged after the January 2004 flooding accident that supposedly destroyed all of Defendants' documents.  <u>See</u> Lee Deposition p. 16, ln. 21-23.

17

Hearsay, as defined by the Federal Rules of Evidence, is an oral or written assertion by a declarant that is offered into evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801, 802.  Exhibit A is clearly hearsay, a written assertion by a mysterious part-time female employee (who Defendants have never identified) who presumably "reprepared" the contents of original work records onto Exhibit A.

Exhibit A also does not fit into any allowable hearsay exception under either Rule 803 or Rule 804 of the Federal Rules of Evidence.  Exhibit A is clearly not a business record as defined by Rule 803(6).  Such a record requires a "memorandum" that is "made at or near the time by . . . a person with knowledge" that is "kept in the course of a regularly conducted business activity." Fed. R. Evid. 803(6).  Exhibit A does not come close to fitting this description.  Defendant Lee explained that the motivation for creating Exhibit A was what he termed a "blackmail letter" from Plaintiff's previous attorney asserting Plaintiff "did not get overtime payment."  Lee Deposition, p. 74, ln. 8-12.  Plaintiff's prior counsel wrote a demand letter to Defendants dated April 5, 2004.  In response to this demand letter (sent more than a month after Plaintiff's employment had ended, more than two months after the flooding accident), Defendant Lee stated:

> As I recall, I asked a part-time female employee, who worked at the time to collect the surviving records after the water damage and prepare this kind of documents because I feared that something like this case would come up.

Lee Deposition, p. 74, ln. 19-23.

In other words, Exhibit A was a one-time creation, made explicitly for the purposes of this litigation[10] and prepared well after the periods of time detailed in the original work records

---

[10] The Advisory Committee Notes to Fed. R. Evid. 803(6) clearly disapproved of "business records" made for litigation, specifically citing to a Supreme Court decision, Palmer v. Hoffman, 318 U.S. 109 (1943) that upheld the exclusion of an accident report by the defendant railroad's

(if they existed), allegedly by a part-time employee without direct knowledge of Plaintiff Yang's work.  Exhibit A should be barred from use at trial as inadmissible hearsay.

**2.    Defendants Are Guilty of Spoliation of Plaintiff's Original Work Records, To the Extent that Such Work Records Existed.**

Plaintiff contends that Defendants violated their Federal and state statutory duties by not making and keeping his detailed employment records.  To the extent that such original work records ever existed – which Plaintiff Yang disputes – and Exhibit A was based on them, Defendants have committed spoliation – they have destroyed, hidden, or intentionally failed to produce these original work records.  As a result, Exhibit A should be barred from entry into evidence and a negative inference should be made on this issue against Defendants.

While Defendants claim that Exhibit A was created from original work records of Plaintiff's employment, they have failed to produce these original work records and claim they do not exist.  If these documents truly existed (and Plaintiff claims they did not), then they have been destroyed or intentionally withheld from production.   It is well-established law that "a party's intentional destruction[11] of evidence relevant to proof of an issue at trial" can support a negative inference against the party who has destroyed such evidence.  Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).  A party seeking to impose such an adverse inference must establish three things: (1) that the party having control over the evidence had an obligation to preserve it when it was destroyed; (2) that the records were destroyed with "a culpable state of mind," and (3) that the destroyed evidence was relevant to the party's claim or defense.  See

engineer, noting that "the report was prepared for use in litigating, not railroading" and that it was "dripping with motivations to misrepresent."  See Advisory Committee Notes, Fed. R. Evid. 803(6).

[11] Courts have noted that spoliation cases need not require actual destruction of evidence. Documents that are missing or are not produced can also be the basis for spoliation cases.  See Residential Funding Corporation v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002).

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).

The obligation to preserve evidence arises when a litigant is "on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence." Turner v. Hudson Transit Lines, 142 F.R.D. 68, 73 (S.D.N.Y. 1991). This obligation exists even before litigation if a party is on notice that litigation is likely. See Smith v. City of New York, 2005 U.S. Dist. LEXIS 231, 22 (S.D.N.Y. 2005); Kronisch. As noted above, Defendant Lee explained in his deposition that he had received a letter from Plaintiff's attorney warning of a lawsuit, and that he had Exhibit A created based on original work records in response. There can be no dispute that Defendants knew litigation was likely and that the evidence contained in these surviving work records were not only relevant – they were critical. Defendants clearly had the obligation to preserve these original work records.

A party must also show that the spoliator acted with a "culpable state of mind." Residential Funding Corp., 306 F.3d at 108. This element does not require a showing of bad faith or intent; the negligent failure to produce evidence can also satisfy this "state of mind" factor. See id.; Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 109 (2d Cir. 2001).

Plaintiff contends that the destruction of any original records that existed was intentional, and grossly negligent at the least. A party's actions in the face of litigation bear into the culpability determination. Courts have held that "the utter failure to establish some sort of litigation hold at the outset of litigation is grossly negligent." Heng Chan v. Triple 8 Palace, 2005 U.S. Dist. LEXIS 16520, 19 (S.D.N.Y. 2005). This Court also found that a party who had simply misplaced and lost evidence she had thought inadmissible, was still culpable enough to have preclusion of evidence and an adverse instruction applied. Barsoum v. N.Y. City Hous.

Auth., 202 F.R.D. 396 (S.D.N.Y. 2001).

Defendants in this case misplaced or lost Plaintiff's work records – records that they knew would be not only admissible but of critical importance to any litigation.  If Defendant Lee can be believed, Defendants possessed Plaintiff Yang's work records more than two months *after* the flooding accident, [12] since Defendant Lee had these documents "reprepared" after receiving an April 5, 2004 demand letter from Plaintiff's former attorney.  Yet they failed to secure these documents (if they existed), or at the least make photocopies of these documents.  Indeed, Defendants' pattern of nonproduction – the unexplained absence of the post-accident work records or time cards for either Plaintiff or his coworkers, the contention that only Plaintiff's work records had survived and been reprepared, the disappearance of Plaintiff Yang's pre-accident work records – indicates that the loss of these records (assuming their existence) was not merely grossly negligent, it was intentional.

A party must also show that the missing evidence be "relevant"[13] to its claim and defenses.   The Residential Funding Corp. court ruled that a finding that the culpable state of mind was either intentional or grossly negligent was by itself enough to meet the third factor of "relevance."  See id. at 109.  As asserted above, Plaintiff contends that Defendants' state of mind was intentional in destroying the original work records.  Even if this Court does not find Defendants' state of mind to be intentional, however, it is undeniable that the existence of these records is "relevant."  If Plaintiff's original work records existed and they did not reflect Defendants' contentions, Defendants' defenses that they kept proper records and paid proper

[12] Defendants do not provide an exact date for the flooding accident, but claim that it occurred in January of 2004. See Lee Deposition p. 16, ln. 21-23.
[13] "Relevance" does not mean "relevance" in the strictly evidentiary sense; the party must show that a reasonable trier could sufficiently infer that the evidence would be unfavorable to the non-producing party.  See Byrnie, 243 F.3d at 110, Residential Funding Corp., 306 F.3d at 109.

overtime wages will undoubtedly be negatively impacted.  These absent work records are clearly "relevant" to the case at bar.

Plaintiff thus can meet the three elements required for a negative inference for spoliation of evidence.  In these situations, courts are not limited only to making such an inference, but in fact "have broad discretion in fashioning an appropriate sanction."  Residential Funding Corp., 306 F.3d at 107.  This Court should bar the entry of Exhibit A into evidence and impose a negative inference against Defendants – i.e, that if such records existed, they would have supported Plaintiff's recollection of his wages and hours.

C.  **DEFENDANTS' FACTUAL ASSERTIONS ARE CONTRADICTORY, NOT CREDIBLE, AND DO NOT MEET THEIR BURDEN**

Even if the Court does not bar the entry of Exhibit A as evidence, the inconsistencies between Exhibit A and the deposition testimony of Defendant Lee and Hyung Park raise serious questions about the credibility of these sources.  Moreover, if Defendants' evidence were indeed credible, it falls far short of meeting the Mt. Clemens burden of showing the "precise amount of work performed" or evidence to negate the reasonableness of Plaintiff Yang's recollections.

1.  **Defendants' Assertions Regarding Plaintiff Yang's Hours is Contradictory and Imprecise**

Defendants' evidence regarding non-holiday work schedules is contradictory and confusing.  Mr. Park, the only other Gold Lee/ACBL employee who had manager-like duties, testified that the regular work schedule was 9:00 a.m. to 5:00 p.m., and that employees worked 40 hours per week.  See Park Deposition, p. 17, ln. 18-24.  Defendant Lee, however, testified that the regular work schedule of his employees was 9:30 a.m. to 6:30 p.m., for 45 hours per week, and that Plaintiff Yang also worked 45 hours per week.  See Lee Deposition, p. 50, ln. 12-15, p. 71, ln. 19-22.  Defendant Lee even insisted that "there are no Korean companies where the

employees work only 40 hours per week." Lee Deposition, p. 106, ln. 13-14. Exhibit A, however, contradicts Defendant Lee by indicating that wages were based on 40 hours per week.[14] It is unclear exactly what Defendants think the regular work schedule actually was.

Defendants' evidence on the overtime work schedule during the holiday periods is similarly inconsistent. Mr. Park claimed that the maximum hours of overtime he worked in a week was 12 hours. See Park deposition, p. 19, ln. 7-9, p. 20, ln. 8-11. Since Mr. Park claimed that he was the last employee (besides Defendant Lee) out of the factory and that he "checked for the last" employee, his 12 hours of overtime should theoretically be the most any employee worked. See Park Deposition, p. 21, ln. 2-9. Yet Exhibit A lists Plaintiff Yang as working up to 32 hours of overtime – almost triple Mr. Park's "maximum" overtime hours – and show him working more than Mr. Park's 12-hour "maximum" for a total of 16 weeks. See Exhibit A, Bates # 3, 5, 7, 9, 11. Defendant Lee also testified that Plaintiff Yang's working overtime during the holiday seasons "not for long . . . for 1 or 2 weeks." Lee Deposition, p. 71, ln. 8-15. According to Exhibit A, however, Mr. Yang worked overtime during these holiday seasons for periods of 5 weeks (1999), 5 weeks (2000), 4 weeks (2001), 6 weeks (2002), and 6 weeks (2003). See Exhibit A, Bates # 3, 5, 7, 9, 11.

Indeed, Defendants' assertions regarding Plaintiff Yang's hours are striking for their lack of precision. Exhibit A fails to record any of Plaintiff Yang's start or end times for any days of work. When Defendant Lee was asked what his schedule was during the holiday periods, he responded, "[s]ometimes, he worked until 8 or even until 9 p.m. . . there were times he worked longer than the others, but he also worked shorter hours than the others." Lee Deposition, p. 71,

---

[14] For instance, Exhibit A indicates that in the week of January 7th, 2000, Plaintiff Yang's weekly wage was $300, his "wage for hour" is listed as "7.5." See Exhibit A, Bates #4. For the week of September 6th, 2002, Plaintiff Yang made $400, and his "wage for hour" is listed as "10." See Id., Bates # 9. The calculations must be based on 40 work hours per week.

ln. 16-18, p. 72, ln. 2-4.  When pressed on Plaintiff Yang's possibly working an extended holiday schedule, Lee's response was that "[a]lthough I do not recall precisely, there's a possibility that he did. . . there's no way for me to recall every single thing like that."  Lee Deposition, p. 80, ln. 3-7.  Considering that Defendants must show evidence of "the precise amount of work performed" to negate Plaintiff's recollections, this admission underlines Defendants' inability to meet their burden of proof.

### 2.  Defendants' Contentions Regarding Plaintiff's Wages Are Also Imprecise and Conflicting

Defendants' evidence regarding Plaintiff's wages is similarly vague.  Defendant Lee claimed during the deposition that at the end of Plaintiff Yang's employment, "[a]lthough I do not recall precise amount. . . [Plaintiff] was taking somewhere between $550 and $600, including everything[15]," and that he had been receiving this amount for "a few months, although I do not recall precise [sic]."[16]  Lee Deposition, p. 98, ln. 11-13, p. 100, 13-14.  Exhibit A cannot be relied on for precision either; it indicates that Plaintiff Yang's weekly wage was $425 for the last several months of his employment.[17]  This directly contradicts Defendant Lee's statements.

Defendants' contentions regarding overtime wages is also confusing.  Defendant Lee claimed in his deposition testimony that Plaintiff Yang worked about 45 hours per week.  Lee Deposition, p. 70 ln. 19-22.  Mr. Lee later explained that for an employee whose work schedule

---

[15] These figures of $550 and $600 actually serve to bolster Plaintiff Yang's recollections; as noted in the Proposed Findings of Fact, Plaintiff Yang contends that had made $550 per week until April 2002, when his wages were raised to $600 per week.  Defendant Lee's recollection confirms these amounts – but contradict Exhibit A.

[16] Defendant Lee did remember the $600 amount clearly (if not the length of time) because he remembered that it was Plaintiff Yang's request for a raise to $700 per week that allegedly led to the end of Plaintiff's employment.  See Lee Deposition, p. 97, ln. 19 – p. 98, ln. 6

[17] Exhibit A also shows Plaintiff Yang making significant amounts of overtime during this period for the 2003 holiday season, up to $935 in one week.  This belies Defendant Lee's claim noted above that Plaintiff was making up to $600 "including everything."  See Exhibit A, Bates # 11, Lee Deposition p. 98, ln. 1n. 12-13.

was for 45 hours per week, the weekly compensation would be "based on 40 hours per week, plus five additional hours calculated by 1.5 times overtime."  Lee Deposition, p. 93, ln. 11-15. Defendant Lee also claimed that every employee was paid 5 hours of overtime every week.  Id. at  94, ln. 17-19.  But there is not a single week in Exhibit A that shows Plaintiff Yang working "five additional hours" or earning five hours of overtime calculated at 1.5 times his regular rate of pay.[18]  See Exhibit A.

Ultimately, Defendants rely on a mix of hazy, imprecise memories and contradictory evidence to attempt to meet their burden of proof under Mt. Clemens.  The contradictions between Exhibit A, Defendant Lee's deposition testimony and Mr. Park's deposition testimony are such that none of these are very credible.

Defendants' evidence must meet a higher burden of proof.  As Mt. Clemens so clearly states, Defendants must present evidence to show "the precise amount of work performed," or evidence "to negative the reasonableness of the inference" drawn from Plaintiff Yang's recollections.  Defendants' evidence, however, is notable for its lack of precision and lack of credibility.  Nothing that Defendants offer as evidence has shown that Plaintiff Yang's recollections are incredible or unreasonable.  Defendants thus cannot meet their strict burden of proof to avoid liability on all of Plaintiff's recollected wages and hours.

**CONCLUSION**

Given the presumption that Plaintiff's recollections of his hours and wages are correct, Defendants have a steep mountain to climb to overcome Plaintiff's prima facie case.  Defendants make various contentions - that Plaintiff Yang's wages included overtime wages, that Plaintiff

---

[18] For example, Exhibit A shows Plaintiff Yang earning $400 during the week of September 6, 2002, and his "wage for hour" for that period being "10".  Exhibit A, Bates # 9.  If Plaintiff had been paid according to Defendant Lee's alleged method, he should have been paid an extra 5 hours at $15.00 per hour, or a total of $475 instead of $400.

Yang's work records are gone because of a flooding accident, and that Exhibit A along with deposition testimony is evidence that Plaintiff was paid overtime properly.

Defendants' contentions are unsupported by admissible evidence, lack credibility, and ultimately are not enough to meet their burden. Defendants offer no evidence to show Plaintiff had an agreement that his wages would include overtime. Their exhibit that allegedly details Plaintiff's wages and hours is inadmissible hearsay and smacks of spoliation, and their other forms of evidence are too inconsistent and contradictory to have much credibility. This Court should find that Plaintiff's flat weekly salary did not include overtime payments; that Exhibit A should be barred from trial; that a negative inference should be imposed against Defendants on evidence of Plaintiff's wages and hours; and that Defendants' exhibits do not come close to meeting the strict burden laid out by Mt. Clemens.

**POINT III**

**PLAINTIFF IS ENTITLED TO SPREAD-OF-HOURS WAGES FOR EVERY DAY HE WORKED MORE THAN 10 HOURS**

Plaintiff is entitled by New York State law for all days in which he worked more than 10 hours per day.  New York State law mandates that "(a)n employee shall receive one hour's pay at the basic minimum hourly rate . . .for any day in which (a) the spread-of-hours exceeds 10 hours."  12 N.Y.C.R.R. § 142-2.4.

As noted above, in the absence of accurate records, New York State law places the burden on the employer to show that Plaintiff was properly paid.  See N.Y. Lab. § 196-a.  Moreover, while the FLSA does not include a "spread-of-hours" provision, courts have made clear that the FLSA and New York Labor Law essentially use the same standards in determining labor law violations.  See Chen v. St. Beat Sportswear, Inc., 364 F. Supp. 2d 269 (S.D.N.Y. 2005) (applying Federal law to question of "joint employment" under state law); Topo v. Dhir, 2004 U.S. Dist. LEXIS 4134, 10 (S.D.N.Y. 2004) (applying "consistent interpretations" of FLSA and New York regulations regarding the definition of an employee).  As a result, this Court should apply the same evidentiary standards for Plaintiff's wages and hours for the purposes of "spread-of-hours" as it does for overtime.  See Velez v. Majik Cleaning Serv., 2005 U.S. Dist. LEXIS 709, 17 (S.D.N.Y 2005) (finding that whether defendant "complied with Federal and New York law governing the payment of overtime and spread-of-hours compensation is a common legal question . . . a common question of fact.").  Lacking any credible records, the burden is on Defendants to show that Plaintiff was properly paid.

As with overtime, Plaintiff's recollections of his hours are sufficient to establish the days in which his "spread-of-hours" exceeded 10 hours.  Both Federal and New York courts have

found that in the absence of records, an employee's recollections alone are sufficient as a "just and reasonable inference" that an employee worked the claimed days with a spread-of-hours that exceeded 10 hours and awarded spread-of-hours damages.  Zeng Liu v. Jen Chu Fashion Corp., 2004 U.S. Dist. LEXIS 35 (S.D.N.Y. 2004),  Bauin v. Feinberg, 2005 N.Y. Slip Op. 50343U (2005).  Plaintiff maintains that he worked from 9:00 a.m. until past 7:00 p.m. (sometimes until 8:00 p.m.) almost every day of work; he estimates that he did not work past 7:00 p.m. for only three-to-five days per year.  A detailed breakdown of Plaintiff's spread-of-hours damages (based on every day except five days per year) is included in Appendix 1.

As with the issue of overtime, Defendants will surely argue at trial that Plaintiff has overestimated his workdays incurring spread-of-hours.  This issue, however, only highlights the fact that Defendants offer no evidence of the precise amount of work performed to refute Plaintiff's recollections.  Exhibit A does not even include start or end times for Plaintiff Yang's work.  Defendant Lee also offered no precise evidence to refute Plaintiff's recollections, offering only that "sometimes [Plaintiff] worked until 8 or even until 9 p.m.," and that even on Saturdays and Sundays during the holiday season, "he probably worked regular hours, but if there were more work, then he worked longer."  Lee Deposition p. 71, ln. 16-19, p. 79, ln. 7-12.

It is worth noting that the Second Circuit affirmed a district court's choice for a plaintiff's admittedly over-inclusive estimates over an employer's under-inclusive estimates, noting that "in opting for [plaintiff's estimate of damages], the district court – consistent with the lesson of Mt. Clemens – placed the burden of inadequate record keeping on the employer."  Reich v. Southern New England Telecomm. Corp., 121 F.3d 58, 70 (2d. Cir. 1997).  The court explained that "although [the employer's] evidence indicates that the award might have been somewhat generous, the evidence does not affect the reasonableness of the award.  It simply points out the

28

difficulty of precisely determining damages when the employer has failed to keep adequate records." Id. at 70, n.3.

In the case at bar, Plaintiff's estimates are presumptively accurate and not over-inclusive. Plaintiff is thus entitled, based on his recollections of his hours, to spread-of-hours damages of an extra hour at the minimum wage for every day he worked more than 10 hours.

**POINT IV**

**DEFENDANTS HAVE COMMITTED CONVERSION REGARDING PLAINTIFF'S WAGES**

Defendants have committed the tort of conversion as to deductions from Plaintiff's paycheck that they claimed were taken to pay Plaintiff's employment taxes. Since Defendants never actually paid any such taxes on Plaintiff's behalf, they are liable for these deducted portions of Plaintiff's wages.

In general, the tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner. Key Bank of New York v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403 (3d Dept. 1996). A cause of action for conversion of money must pass a two-prong test. First, the plaintiff must allege that he had ownership, possession or control of the money which is the subject of the action. Fiorenti v. Central Emergency Physicians, P.L.L.C., 187 Misc.2d 805, 723 N.Y.S.2d 851 (N.Y. Sup. 2001). This money must be specific and identifiable. Id. Second, it must be shown that the defendant exercised unauthorized dominion over the money, to the exclusion of the plaintiff's rights. See, e.g., AMF Inc. v. Algo Distributors, Ltd., 40 A.D.2d 352, 369 N.Y.S.2d 460 (2d Dept.1975).

Plaintiff Yang meets the first prong, since he clearly had legal ownership and rights to his wages. The deductions were made directly from Plaintiff's wages, the full amount of which he is legally entitled to. At the beginning of April 2002, when Plaintiff's wages were raised from $550 per week to $600 per week, Plaintiff asked Defendants to put him on the official payroll, even though it meant taxes would be taken from his wages. See Lee Deposition, p. 85, ln. 9-11. Defendants told Plaintiff that they would pay him half of his wages, or $300, in cash. Defendants also told Plaintiff that they would pay him $300 by check, and that they would take

30

$29 from his paycheck to pay Plaintiff's employment taxes.  See Lee Deposition, p. 82, ln. 3-4.

Plaintiff agreed to this deduction, which Defendants took from 12 paychecks from June 21, 2002

to October 21, 2002.  Since Plaintiff had been receiving his full wages of $600 beforehand with

no deductions, it is clear that Plaintiff was entitled to this money before Defendant deducted it.

Since each deduction was worth $29 and was taken from a total of 12 paychecks, the money in

question is both specific and identifiable.

Plaintiff can also meet the second prong by showing that Defendants exercised

unauthorized dominion over these deductions.  Defendants were merely authorized to use the

deductions as employment tax payments, not to pocket the money.  Defendants' actions resulted

in a violation of Plaintiff's property rights, since he no longer had access to the money.

Defendants may try to argue that this prong is not met since Plaintiff agreed to the

deductions back when they were being taken.  However, a conversion may occur even where the

original possession is lawful, if there is a subsequent demand and refusal to return the property.

See D'Amico v. First Union Nat. Bank, 285 A.D.2d 166,728 N.Y.S.2d 146 (1st Dept. 2001).

Since Plaintiff did indeed make a demand for the deducted amount, which Defendants refused,[19]

Defendants' argument will fail.

Defendants may also claim that their conversion was unintentional.  However, a transfer

may still be wrongful and constitute a conversion even when the defendant acted in good faith.

See New York City Transit Authority v. New-York Historical Society, 176 Misc.2d 31, 635

N.Y.S.2d 998 (N.Y. Sup.1995).  All that is necessary is that the defendant had no right to possess

---

[19] Defendants claim that "7 to 10 days" after Plaintiff's wages by check were discontinued and
he was paid again all in cash, Defendant Lee repaid Plaintiff the deducted money along with his
weekly wages.  See Lee Deposition, p. 85, ln. 14-22.  Defendant Lee admitted, however, that he
neither had any record for this repayment, nor did he remember how much it was.  See id. at p.
85,  ln. 23-25, p. 86, ln. 2-6.  In addition, Exhibit A shows no such extra payment for the period
Lee allegedly paid Plaintiff this repayment.

the property in question.  Id.   In this case, Plaintiff claims that the conversion of these

deductions was more than unintentional; it is sufficient to note here that Defendant indeed no

right to possess the deductions but should have paid them out as employment taxes.  Defendants

thus have committed conversion in respect to the deductions taken from Plaintiff's paychecks,

and Plaintiff is entitled to the converted total of $371.00.[20]

Defendants are also liable for punitive or exemplary damages.  Such damages are

awarded when there is malice, or a reckless or willful disregard for a plaintiff's property interest.

See Manekas v. Allied Discount Co., 6 Misc.2d 1079, 166 N.Y.S.2d 366 (N.Y.Sup. 1956);

Airlines Reporting Corp. v. Aero Voyagers, Inc., 721 F. Supp. 579, 586 (S.D.N.Y. 1989).  Here,

Defendant Lee took these deductions while intentionally keeping him off the payroll and

refusing to pay Plaintiff's employment taxes as Plaintiff had asked.  Defendant also offers no

excuse for not paying such taxes.

Punitive damages should bear "some reasonable relation to the harm done and the

flagrancy of the conduct." I.H.P. Corp. v. 210 Cent. Park South Corp., 16 A.D.2d 461, 467, 228

N.Y.S.2d 883 (1st Dept. 1962).  Since the conversion in this case resembles an improper

deduction as defined by New York state law and such a deduction carries a liquidated damages

penalty of 25%, Plaintiff asks for punitive damages of 25% to be awarded on his conversion

claim.[21]  See N.Y. Lab. §§ 193, 198(1-a).

---

[20] Since Defendants converted the amount of $29.00 from 12 of Plaintiff's paychecks, the total
amount of converted deductions amounts to $371.00.
[21] The court in I.H.P. Corp. awarded treble punitive damages because a statutory damages
provision also assessed treble damages for a similar violation, and thus was "an appropriate
analogue." Id. at 467.

**POINT V**

**DEENDANT HAN SUNG LEE IS AN EMPLOYER AND JOINTLY AND
INDIVIDUALLY LIABLE FOR PLAINTIFF'S UNPAID WAGES**

Defendant Lee is clearly Plaintiff Yang's "employer" under both the FLSA and New York Labor Law, and shares liability with both Gold Lee and ACBL for Plaintiff Yang's wages. Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  New York Labor Law expands on this definition by declaring it as "the person employing any such mechanic, workingman or laborer, whether the owner, proprietor, agent, superintendent, foreman or other subordinate."  N.Y. Lab. § 2(6).  Because Defendant Lee was the owner and manager of the factory, he is an "employer" under both Federal and New York state definitions.

He is the "employer" as defined by courts as well.  In applying the FLSA's broad, expansive definition, Federal courts have used an "economic reality" test that examines the "totality of the circumstances," weighing such factors as the power to hire and fire employees, control schedules and conditions of employment, set employees' wages, and maintain records.  See, e.g., Herman v. RSR Sec. Servs., 172 F.3d 132, 139 (2d Cir 1999).  It has been stipulated that Defendant Lee is the sole owner of both Gold Lee and ACBL and ran the day-to-day activities of the businesses, and that he had the power to hire and fire Plaintiff, set his work schedule.  See Stipulation of Facts # 2, 4, and 9.  Defendant Lee also admitted during his deposition that he had the power to set employee wages, and maintain work records.  See Lee Deposition, p. 66, ln. 8-11, p. 43, ln. 13-15.  No other employees had such powers.  See Stipulation of Facts # 9.  This Court should find that Defendant Lee is Plaintiff's employer under Federal and New York law and is jointly and severally liable for Plaintiff Yang's damages.

33

## POINT VI

## DEFENDANTS' VIOLATIONS OF WAGE AND HOUR LAWS WERE INTENTIONAL

### A.  A THREE-YEAR STATUTE OF LIMITATIONS IS APPLICABLE UNDER THE FLSA

Defendants' reckless disregard of their obligations should result in a three-year statute of limitations for Plaintiff Yang's claims.  The FLSA states that its statute of limitations, usually two years, is extended to three years if there is a "willful violation."  See 29 U.S.C. § 255(a). The Supreme Court has held that a violation is "willful" is the employer either knew or showed "reckless disregard as to whether its conduct was prohibited by the statute."  McLaughlin v. Richland Shoe Co., 286 U.S. 128, 133 (1988).

Willfulness has been found when an employer did not investigate whether its overtime policy was legal, and when employers did not consult with attorneys to determine if its agreements were legal.  See Hardrick v. Airway Freights Systems, Inc., 63 F. Supp. 2d 898, 904 (N.D. Ill. 1999); see also Herman, 172 F.3d at 142 (applying a three-year statute of limitations because employer "could easily have inquired" into steps for compliance); Alvarez v. IBP, Inc., 339 F.3d 894, 909 (9th Cir.) (upholding three-year statute of limitations because employer "took no affirmative action to assure compliance" with FLSA requirements).

In the case at bar, it is clearly evident that Defendants showed willful or reckless disregard of the FLSA.  As is noted *supra* in I. A, Defendants violated Federal and state record-keeping requirements regarding the Plaintiff's employment agreement, payment slips, and detailed records of Plaintiff Yang's wages and hours.  Defendants' insistence that no such other records exist for Plaintiff's coworkers indicate that these violations extend to them as well. When Defendant Lee was asked whether he consulted with a lawyer about his legal responsibility for overtime, Defendant Lee questioned the very idea: "Why is it necessary for me

to discuss that with a lawyer when I already understand about it?"  Lee Deposition, p. 104, ln. 6-7, 17-19.

Defendant Lee's attitude towards the legality of his practices is the very embodiment of "reckless disregard."  It is part of a general pattern of Defendants' reckless disregard and open violations of both state and federal labor laws.  A three-year statute of limitations should apply to Defendants' violations under the FLSA.

**B.   PLAINTIFF YANG IS ENTITLED TO FEDERAL AND STATE LIQUIDATED DAMAGES**

Plaintiff Yang should receive full liquidated damages for both his Federal and state claims.  Under the FLSA, an employer who violates the minimum wage or overtime laws is liable for "an additional equal amount as liquidated damages."  See 29 U.S.C. § 216(b).  Courts nominally have the discretion to limit or disallow liquidated damages when employers can show they acted in good faith and they had reasonable grounds for believing their acts or omissions were not FLSA violations.  See 29 U.S.C. § 260; Moon, 248 F.Supp.2d at 234.

In reality, however, "double damages are the norm, single damages the exception." Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987) [quoting Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986)].  Employers face a high burden of proof that is a "difficult one to meet"; courts have ruled that the "good faith exception  . . . has been construed narrowly.  Brock, 833 F.2d at 19, Rogers v. City of Troy, 148 F.3d 52, 56 n.2 (2d Cir. 1998).  An employer must "take active steps to ascertain the dictates of the FLSA and then move to comply with them."  Reich, 121 F.3d at 71.  Even if the employer meets its burden, a court may still "in the exercise of its discretion, award liquidated damages under the express language of the statute."  Id.

In the case at bar, Defendants have demonstrated nothing to show that they took any

active steps to learn about or comply with the FLSA's provisions.  This Court found in <u>Moon</u>
that liquidated damages applied because the defendant employers "made no effort to comply
with basic recordkeeping requirements of federal and state law, paid its employees off-the-books
in cash knowing full well [such practice] violated federal and state tax laws, and knowingly
failed to compensate [plaintiff] for extensive overtime work over a period of many years."
<u>Moon</u>, 248 F. Supp. 2d at 234-5.  Similarly, Defendants' have shown no active steps to comply;
instead, their numerous violations of the FLSA's record-keeping requirements and overtime
requirements are evidence of their open disregard for compliance.  Defendants Plaintiff Yang is
thus entitled to full liquidated damages under the FLSA.

Under New York Labor Law, an employer faces a similar burden.  An employer must
pay an additional twenty-five percent of wages owed if it is determined that the employer's
failure to pay was willful.  <u>See</u> N.Y. Lab. § 198(1-a), 663(1).  A failure to pay is "willful" when
the employer knowingly, deliberately, or voluntarily disregards its legal obligations.  <u>See</u> <u>Ayres
v. 127 Restaurant Corp.</u>, 12 F. Supp. 2d 305, 309 (S.D.N.Y. 1998).  Indeed, "no finding of bad
faith or malice . . . is necessary."  <u>Id.</u>  In <u>Ayres</u>, the court found that the employer's failure to
make "reasonable inquiries" into the relevant law, to review its tip pooling practices, or to seek
the advice of counsel as to legality exposed it to New York liquidated damages.  <u>See</u> <u>Id.</u>

Defendants have offered no evidence that they have taken any of these steps.  Instead,
their uncontroverted failures to provide detailed payment slips or a written memorandum of the
employment agreement as required under New York State law indicate a larger pattern of
willfulness towards state labor laws.  Because of this conduct, Plaintiff Yang is entitled to
liquidated damages under New York State labor laws.

Plaintiff is also entitled to full Federal and New York state liquidated damages for the same overtime damages, since Federal and state liquidated damages provide different remedies. See Reilly v. NatWest Market Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999) (describing the difference between compensatory damages and punitive damages and why both can be awarded in the same award of damages). FLSA liquidated damages provide the plaintiff with compensation for the delay in payment. See Reich, 121 F.3d at 71. On the other hand, New York State labor law liquidated damages are punitive in nature. See Reilly, 181 F.3d at 265.

Plaintiff is thus entitled to 25% New York State liquidated damages on his first three years of overtime damages and on the full six years of spread-of-hours pay. N.Y. Lab. §§ 198 (1-a), 663(1). For the three-year statute of limitations period covered by the FLSA and for the most recent three year period of New York State's six-year statute of limitations period, Plaintiff is entitled to both 100% Federal liquidated damages and 25% state liquidated damages on his overtime claims. See id.; 29 U.S.C. § 216(b). Finally, plaintiff is entitled to 9% interest on his these state law damages. See N.Y. C.P.L.R. § 5001; Reilly.[22] A detailed breakdown of Plaintiff's liquidated damages and interest is included in Appendix 1.


Dated: October __, 2005                   _____/s_____
                                          Steven Choi (SC1906)
                                          Kenneth Kimerling (KK5762)
                                          ASIAN AMERICAN LEGAL DEFENSE
                                             AND EDUCATION FUND
                                          99 Hudson Street
                                          New York, New York 10013
                                          212-966-5932
                                          Attorneys For Plaintiff

---

[22] Plaintiff has calculated the interest payments based on a mid-point, the calculation of which is explained in Appendix 2. See N.Y. C.P.L.R. § 5002.

## APPENDIX 1 : Plaintiff's Estimate of Damages

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 7/18/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | [7], Sat |
| 7/25/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 8/1/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 8/8/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 8/15/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 8/22/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 8/29/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 9/5/1999 | $350.00 | 42 | 2 | $7.00 | $10.50 | $7.00 | $0.00 | $21.25 | Labor Day off |
| 9/12/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 9/13/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 9/20/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 9/27/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 10/3/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 10/10/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 10/17/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 10/24/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 10/31/1999 | $350.00 | 60.5 | 20.5 | $7.00 | $10.50 | $35.00 | $110.25 | $21.25 | Sat |
| 11/7/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 11/14/1999 | $350.00 | 53 | 13 | $7.00 | $10.50 | $35.00 | $31.50 | $25.50 | [8] |
| 11/21/1999 | $350.00 | 91 | 51 | $7.00 | $10.50 | $35.00 | $430.50 | *$29.75* | |
| 11/28/1999 | $350.00 | 91 | 51 | $7.00 | $10.50 | $35.00 | $430.50 | *$29.75* | |
| 12/5/1999 | $350.00 | 91 | 51 | $7.00 | $10.50 | $35.00 | $430.50 | *$29.75* | |
| 12/12/1999 | $350.00 | 91 | 51 | $7.00 | $10.50 | $35.00 | $430.50 | *$29.75* | |
| 12/19/1999 | $350.00 | 64.5 | 24.5 | $7.00 | $10.50 | $35.00 | $152.25 | $25.50 | [9], Christmas off |
| 12/26/1999 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | New Year's off |
| 1/2/2000 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 1/9/2000 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 1/16/2000 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 1/23/2000 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 1/30/2000 | $350.00 | 52.5 | 12.5 | $7.00 | $10.50 | $35.00 | $26.25 | $21.25 | |
| 2/6/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 2/13/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 2/20/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 2/27/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 3/5/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 3/12/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 3/19/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $21.25 | |
| 3/26/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $22.15 [10] | |
| 4/2/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 4/9/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 4/16/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 4/23/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 4/30/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 5/7/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 5/14/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 5/21/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 5/28/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 6/4/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 6/11/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 6/18/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 6/25/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 7/2/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 7/9/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 7/16/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 7/23/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 7/30/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 8/6/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 8/13/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 8/20/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 8/27/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 9/3/2000 | $400.00 | 42 | 2 | $8.00 | $12.00 | $8.00 | $0.00 | $20.60 | Labor Day off |
| 9/10/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 9/17/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 9/24/2000 | $400.00 | 52.5 | 12.5 | $8.00 | $12.00 | $40.00 | $30.00 | $25.75 | |
| 10/1/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 10/8/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |

Appendix 2

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 10/22/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 10/29/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 11/5/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 11/12/2000 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 11/19/2000 | $450.00 | 91 | 51 | $9.00 | $13.50 | $45.00 | $553.50 | $36.05 [11] |
| 11/26/2000 | $450.00 | 91 | 51 | $9.00 | $13.50 | $45.00 | $553.50 | $36.05 | |
| 12/3/2000 | $450.00 | 91 | 51 | $9.00 | $13.50 | $45.00 | $553.50 | $36.05 | |
| 12/10/2000 | $450.00 | 91 | 51 | $9.00 | $13.50 | $45.00 | $553.50 | $36.05 | |
| 12/17/2000 | $450.00 | 91 | 51 | $9.00 | $13.50 | $45.00 | $553.50 | $30.90 [12] |
| 12/24/2000 | $450.00 | 42 | 2 | $9.00 | $13.50 | $9.00 | $0.00 | $20.60 | Christmas off |
| 12/31/2000 | $450.00 | 42 | 2 | $9.00 | $13.50 | $9.00 | $0.00 | $20.60 | New Year's off |
| 1/7/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 1/14/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 1/21/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 1/28/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 2/4/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 2/11/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 2/18/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 2/25/2001 | $450.00 | 52.5 | 12.5 | $9.00 | $13.50 | $45.00 | $33.75 | $25.75 | |
| 3/4/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 3/11/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 3/18/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 3/25/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 4/1/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 4/8/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 4/15/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 4/22/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 4/29/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 5/6/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 5/13/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 20-May | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 5/27/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 6/3/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 6/10/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 6/17/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 6/24/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 7/1/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 7/8/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 7/15/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 7/22/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 7/29/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 8/5/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 8/12/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 8/19/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 8/26/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 9/2/2001 | $500.00 | 42 | 2 | $10.00 | $15.00 | $50.00 | $0.00 | $20.60 | Labor Day off |
| 9/9/2001 | $500.00 | 63 | 23 | $10.00 | $15.00 | $10.00 | $195.00 | $30.90 | [13] |
| 9/16/2001 | $500.00 | 86 | 46 | $10.00 | $15.00 | $50.00 | $540.00 | $36.05 | |
| 9/23/2001 | $500.00 | 86 | 46 | $10.00 | $15.00 | $50.00 | $540.00 | $36.05 | |
| 9/30/2001 | $500.00 | 86 | 46 | $10.00 | $15.00 | $50.00 | $540.00 | $36.05 | |
| 10/7/2001 | $500.00 | 86 | 46 | $10.00 | $15.00 | $50.00 | $540.00 | $36.05 | |
| 10/14/2001 | $500.00 | 63 | 23 | $10.00 | $15.00 | $50.00 | $195.00 | $30.90 | [14] |
| 10/21/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 10/28/2001 | $500.00 | 52.5 | 12.5 | $10.00 | $15.00 | $50.00 | $37.50 | $25.75 | |
| 11/4/2001 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 11/11/2001 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 11/18/2001 | $550.00 | 77 | 37 | $11.00 | $16.50 | $55.00 | $445.50 | $30.90 | [15] |
| 11/25/2001 | $550.00 | 90 | 50 | $11.00 | $16.50 | $55.00 | $660.00 | $36.05 | |
| 12/2/2001 | $550.00 | 90 | 50 | $11.00 | $16.50 | $55.00 | $660.00 | $36.05 | |
| 12/9/2001 | $550.00 | 90 | 50 | $11.00 | $16.50 | $55.00 | $660.00 | $36.05 | |
| 12/16/2001 | $550.00 | 77 | 37 | $11.00 | $16.50 | $55.00 | $445.50 | $30.90 | [16] |
| 12/23/2001 | $550.00 | 42 | 2 | $11.00 | $16.50 | $11.00 | $0.00 | $20.60 | Christmas off |
| 12/30/2001 | $550.00 | 42 | 2 | $11.00 | $16.50 | $11.00 | $0.00 | $20.60 | New Year's off |
| 1/6/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 1/13/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 1/20/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 1/27/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 2/3/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 2/10/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |

Appendix 4

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 2/17/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 2/24/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 3/3/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 3/10/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 3/17/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 3/24/2002 | $550.00 | 52.5 | 12.5 | $11.00 | $16.50 | $55.00 | $41.25 | $25.75 | |
| 3/31/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 4/7/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 4/14/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 4/21/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 4/28/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 5/5/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 5/12/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 5/19/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 5/26/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 6/2/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 6/9/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 6/16/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 6/23/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 6/30/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 7/7/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 7/14/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 7/21/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 7/28/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 8/4/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 8/11/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 8/18/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 8/25/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/1/2002 | $600.00 | 42 | 2 | $12.00 | $18.00 | $12.00 | $0.00 | $20.60 | Labor Day off |
| 9/8/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/15/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/22/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/29/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/6/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/13/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/20/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 10/27/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/3/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/10/2002 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/17/2002 | $600.00 | 73.5 | 33.5 | $12.00 | $18.00 | $60.00 | $423.00 | $30.90 [17] |
| 11/24/2002 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 12/1/2002 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 12/8/2002 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 12/15/2002 | $600.00 | 84 | 44 | $12.00 | $18.00 | $60.00 | $612.00 | $30.90 [18] |
| 12/22/2002 | $600.00 | 42 | 2 | $12.00 | $18.00 | $12.00 | $0.00 | $20.60 | Christmas off |
| 12/26/2002 | $600.00 | 42 | 2 | $12.00 | $18.00 | $12.00 | $0.00 | $20.60 | New Year's off |
| 1/5/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/12/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/19/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/26/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/2/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/9/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/16/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/23/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 3/2/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| **3/9/2003** | **$600.00** | **31.5** | **0** | **$12.00** | **$18.00** | **$0.00** | **$0.00** | **$15.45** [19] |
| **9/7/2003** | **$600.00** | **52.5** | **12.5** | **$12.00** | **$18.00** | **$60.00** | **$45.00** | **$25.75** [20] |
| 9/14/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/21/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 9/28/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/5/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/12/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/19/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 10/26/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/2/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/9/2003 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 11/16/2003 | $600.00 | 70 | 30 | $12.00 | $18.00 | $60.00 | $360.00 | $30.90 [21] |
| 11/23/2003 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 11/30/2003 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 12/7/2003 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 | |
| 12/14/2003 | $600.00 | 90 | 50 | $12.00 | $18.00 | $60.00 | $720.00 | $36.05 [22] |

Appendix 6

| Start of Week | Wages/Wk[1] | Hours/Wk[2] | OT Hours/Wk | Regular Rate[3] | OT Rate | OT (Half-Time)[4] | OT (Uncomp.)[5] | SOH Due[6] | |
|---|---|---|---|---|---|---|---|---|---|
| 12/21/2003 | $600.00 | 42 | 2 | $12.00 | $18.00 | $12.00 | $0.00 | $20.60 | Christmas off |
| 12/28/2003 | $600.00 | 42 | 2 | $12.00 | $18.00 | $12.00 | $0.00 | $20.60 | New Year's off |
| 1/4/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/11/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/18/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 1/25/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/1/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/8/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/15/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 | |
| 2/22/2004 | $600.00 | 52.5 | 12.5 | $12.00 | $18.00 | $60.00 | $45.00 | $25.75 [23] | |
| | | | | | | | | $5,619.80 | |
| | | | | | | $10,245.00 | $23,667.75 | $5,469.80 [24] | |

| | | |
|---|---|---|
| Total Wages | **$39,382.55** | |
| Fed LD | **$17,613.00** | [25] |
| State LD | **$9,845.64** | [26] |
| Conversion | **$377.00** | |
| Pun. Damages | **$94.25** | [27] |
| Int. (OT) | **$7,540.26** | [28] |
| Int. (SOH) | **$1,964.21** | [29] |
| Int. (Conv.) | **$108.58** | |
| **Total** | **$76,925.48** | |

Appendix 7

## APPENDIX 1 (Explanation of Footnotes)

[1] Based on Plaintiff Yang's recollections.

[2] Based on Plaintiff's recollections.  The schedule is provided in more detail below.

[3] Plaintiff's "regular rate of pay" is calculated by dividing his weekly wage by the 50 hours of work it was intended to compensate.  See 29 C.F.R. § 778.113.

[4] This column calculates Plaintiff's damages for his overtime hours up to the 50 intended hours he worked per week.  Because he was already paid his regular rate of pay, he is owed "half-time" (or the difference between his overtime rate and regular rate) for these hours.  See 29 C.F.R. § 778.325

[5] This column calculates Plaintiff's damages for his overtime hours beyond the 50 intended hours he worked per week, multiplying these hours by the full overtime rate.  See id.

[6] This column calculates Plaintiff's "spread-of-hours" damages by multiplying the days he worked more than 10 hours by the applicable minimum wage.

[7] From July 15, 1999 until November 20, 1999, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday, and from 9:00 to 5:00 p.m. on alternate Saturdays.  As noted in I.B.2, Plaintiff estimates he worked until 7:30 p.m. on average for every day in which he was scheduled to work until 7:00 p.m.

[8] During the holiday period from November 20, 1999 to December 20, 1999, Plaintiff's scheduled hours of work were from 9:00 a.m. to 11:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays.

[9] From December 20, 1999 until November 19, 2000, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[10] The New York state minimum wage was raised from $4.25 to $5.15, applicable on and after March 31, 2000.  See N.Y. Lab. § 652(1).

[11] During the holiday period from November 20, 2000 until December 23, 2000, Plaintiff's scheduled hours of work were from 9:00 a.m. to 11:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays.

[12] From December 24, 2000 until September 14, 2001, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[13] From September 15, 2001 until October 15, 2001, Plaintiff's scheduled hours of work were from 9:00 a.m. to 10:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m., Saturdays and Sundays.

[14] From October 16, 2001 until November 19, 2001, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[15] During the holiday period from November 20, 2001 until December 20, 2001, Plaintiff's scheduled hours of work were from 9:00 a.m. to 11:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays.

[16] From December 21, 2001 until November 19, 2002, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[17] During the holiday period from November 20, 2002 until December 20, 2002, Plaintiff's scheduled hours of work were from 9:00 a.m. to 11:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays.

[18] From December 21, 2002 until March 12, 2003, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[19] Plaintiff left Defendants' employment on March 12, 2003.

[20] Plaintiff began work with Defendants again on September 8, 2003.  From this date until November 19, 2003, Plaintiff's scheduled hours of work were 9:00 a.m. to 7:00 p.m., Monday to Friday.

[21] During the holiday period from November 20, 2003 until December 20, 2003, Plaintiff's scheduled hours of work were from 9:00 a.m. to 11:00 p.m., Monday to Friday, and 9:00 a.m. to 7:00 p.m. on Saturdays and Sundays.

[22] From December 21, 2003 until February 27, 2004, Plaintiff's scheduled hours of work were from 9:00 a.m. to 7:00 p.m., Monday to Friday.

[23] Plaintiff was fired by Defendants on February 27, 2004.

[24] Plaintiff's adjusted spread-of-hours damages.  Plaintiff has estimated that on his regular workdays, he worked until 7:00 p.m. only for three-to-five days per year, as noted in III.  Since he was not entitled to spread-of-hours damages on those days, Plaintiff has adjusted his spread-of-hours damages by removing five days worth of such damages for every year of his employment, at the applicable minimum wage rates.

[25] LD refers to liquidated damages, calculated as explained in VI. B.  Federal liquidated damages are thus calculated by applying a 100% damages penalty to Plaintiff's overtime damages for the three-year statute of limitations period prior to Plaintiff's filing on November 15, 2004.

[26] State liquidated damages are calculated as explained in VI. B. by applying a 25% damages penalty to Plaintiff's overtime and spread-of-hours damages for the entire period.

[27] Punitive damages are calculated as explained in IV. by applying 25% damages to the total amount of conversion.

Appendix 9

[28] Plaintiff has calculated interest on his New York state claims using mid-points to determine the total years of interest, the calculation of which is explained in Appendix 2.  On his overtime claims, Plaintiff has multiplied this midpoint by the statutory 9% interest rate by his overtime damages from the beginning of Plaintiff's overtime claims until the start of the three-year statute of limitations period prior to November 15, 2004.  <u>See</u> N.Y.C.P.L.R. §§ 5001-5002.

[29] Plaintiff has calculated interest on his spread-of-hours damages and conversion claim by multiplying the applicable years of interest by the statutory 9% interest rate by the total damages.  <u>See</u> <u>id.</u>

**APPENDIX 2 : Calculation of Years of Interest (OT, SOH, Conversion)**

Total Years of Interest is calculated by finding the total number of years between 1) the mid-point date of the claim, and 2) the date of trial.  The mid-point date is calculated by finding the difference in days between the start of the claim and the end of the claim, and dividing that by 2.

|  |  | Difference in Days | Mid-Point Date | Years of Interest |  |
|---|---|---|---|---|---|
| Start of Claim (OT & SOH) | 7/15/1999 | 858 | 9/12/2000 | **5.14** | **(OT)** |
| End of Claim (OT) | 11/15/2001 |  |  |  |  |
| End of Claim (SOH) | 2/27/2004 | 1692 | 11/3/2001 | **3.99** | **(SOH)** |
| Start of Claim (Conversion) | 6/21/2002 | 122 | 8/21/2002 | **3.20** | **(Conversion)** |
| End of Claim (Conversion) | 10/21/2002 |  |  |  |  |
| **Date of Trial** | 11/2/2005 |  |  |  |  |

**CERTIFICATE OF SERVICE**

I, Steven K. Choi, do hereby certify under a penalty of perjury that I served on this day, October 26, 2005, via fax and overnight delivery true and correct copies of the attached Plaintiff's Proposed Findings of Fact and Contentions of Law and Plaintiff's Pre-Trial Memorandum of Law together with all attachments on counsel for Defendants:

Eric Stern, Esq.
Sack & Sack, Esqs.
110 East 59th St, 19th Flr
New York, NY 10022


Dated:  New York, New York
        October 26, 2005


                              ____/s_____
                                    Steven Choi