UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DOO NAM YANG,                    :
                                          :
                                          :
                Plaintiff,          :           **<u>MEMORANDUM AND ORDER</u>**
                                          :
     -v.-                               :            04 Civ. 8987 (LBS)
                                          :
ACBL CORP., GOLD LEE JEWELRY      :
CO., and HAN SUNG LEE,          :
                                          :
                                          :
               Defendants.        :
                                          :
-------------------------------------------------------x

SAND, District Judge.

       Plaintiff Doo Nam Yang brings this action under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C.A. § 201 et seq., and the New York Labor Law § 190 et seq., alleging that defendants Gold Lee Jewelry Company ("Gold Lee"), ACBL Corporation ("ACBL"), and Han Sung Lee failed to pay overtime and spread of hours pay.  He also brings a common law claim of conversion, alleging that defendants deducted funds from his wages to pay employment taxes, but neither remitted the funds to the taxing authorities nor returned them to him.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

       The Court held a two day bench trial beginning on November 2, 2005.  The only witnesses were Yang and Lee.  In general, the Court found Yang's testimony to be credible and corroborated by other evidence, while Lee's testimony was replete with contradictions, his demeanor was hostile, and his answers were, for the most part, unworthy of credence.  The Court makes the following findings of fact and conclusions of law.  <u>See</u> Fed. R. Civ. P. 52(a).

FINDINGS OF FACT

I. Parties

Plaintiff Doo Nam Yang is a Korean immigrant who came to the United States on January 17, 1997 and currently lives in Queens. In Korea, Yang graduated high school and worked as a mechanic repairing sewing machines. He was first hired to work for defendants in October 1997 as a trainee, and eventually assumed such duties as ring-making, electric re-wiring, and repairing motors. (Trial Tr. 13-14, Nov. 2-3, 2005.) Although there were several breaks in his employment, the employment relationship terminated for the last time on February 27, 2004.

Defendant Gold Lee was a company engaged in the creation and sale of jewelry. It was founded by defendant Han Sung Lee, who remained its president and sole owner. In 2000, Lee closed Gold Lee and opened defendant ACBL, another jewelry business, in its stead. Since 2000, Lee has been the president and sole owner of ACBL. Lee's business was originally located at 50 West 47th Street #B4, Manhattan, but moved in 2000 to 31 W. 47th Street, Suite 203.


II. Yang's Compensation

A. *Wages*

Although a plaintiff seeking to recover under the FLSA must show insufficient payment for hours worked, under the statute it is the employer's responsibility to "make, keep, and preserve" records of employee wages and conditions of employment. 29 U.S.C. § 211(c); <u>see also</u> 29 C.F.R. § 516.2.[1] When an employer has not kept such records, an employee suing for lost wages under the FLSA may carry his burden by submitting "sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred." <u>Reich v. S. New England Telecomms. Corp.</u>, 121 F.3d 58, 66 (2d Cir. 1997) (<u>quoting</u> <u>Martin v. Selker Bros.</u>, 949 F.2d 1286, 1296-97 (3d Cir. 1991)). The burden then shifts to the employer to present

---

[1] Similar record-keeping requirements exist under New York law. <u>See</u> N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6.

evidence either of the precise wages paid or evidence to "negative the reasonableness of the inference to be drawn from the employee's evidence." <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 688 (1946).[2]  New York law incorporates a similar standard.[3]

Both Lee and Yang testified that, after being introduced by the Director of the Korean American Association for Rehabilitation of the Disabled,[4] Lee interviewed and hired Yang for a trainee position at Gold Lee.  The employment contract was oral (Tr. 77), and there is no evidence that defendants preserved "a written memorandum summarizing the terms" of this oral agreement, as federal law requires.  29 C.F.R. § 516.5(b)(4).  Furthermore, at trial the defendants could not produce admissible records of Yang's wages during the course of his employment.[5]

---

[2]  Although this burden shifting framework was developed in <u>Mt. Clemens</u> to facilitate an employee-plaintiff's presentation of the "amount and extent" of *work* performed, considering the interrelatedness of work and wages, this Court sees no reason why this standard should not also be applied to an employee-plaintiff's presentation of evidence with regard to *wages* received.  <u>Mt. Clemens</u>, 328 U.S. at 687.

[3]  New York Labor Law provides that where an employer fails "to keep adequate records, . . . the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements."  N.Y. Lab. L. § 196-a.

[4]  Yang's right leg was amputated below his knee.  On cross-examination, Lee conceded that this disability did not affect Yang's ability to perform his job at Gold Lee/ACBL.  (Tr. 128.)  However, throughout his testimony, Lee's manner and tone manifested his view that Yang's decision to bring a lawsuit was a betrayal of Lee's past benevolence.

[5]  Defendants, claiming that the original payroll records were damaged when a pipe burst and flooded Lee's office, attempted to introduce into evidence a new document containing the wages allegedly paid to, and hours allegedly worked by, plaintiff.  According to defendants, a "Ms. Lee"—a student whose first name, address, and dates of employment defendants could not supply—spent approximately a half-day recopying the severely damaged yet legible records of wages paid to plaintiff onto this proffered document, and then disposed of the originals.  After voir dire by plaintiff's counsel, this Court sustained plaintiff's hearsay objection to the admissibility of this would-be exhibit.  The Court determined that it was clear that this document was not "kept in the course of a regularly conducted business activity," Fed. R. Evid. 803(6), but was instead prepared in anticipation of litigation, as revealed by such facts as Lee's admission that he asked to have the document prepared only after receiving a letter from plaintiff's first counsel, and that plaintiff was the only employee for whom records were re-created.  (Tr. 98-101.)  In addition, the Court remarked that it was curious that no payroll records were produced for plaintiff's wages for the period he worked for defendant after the flood.  (Tr. 123.)  The Court's exclusion of this document, however, was without prejudice as to its reintroduction if the person who prepared the document were called as a witness.  No such witness was called.

Even though this document was not admitted into evidence, the Court offers two additional observations on the testimony concerning the document's authenticity.  First is the fact that Lee's testimony relating to which records Ms. Lee used to prepare the new document was repeatedly inconsistent.  At one point, Lee claimed that Ms. Lee copied the information from an Accounts Receivable book and invoices, but later he said she used old timecards.  (Tr. 95, 103.)  In addition, during Lee's direct testimony he claimed that he personally checked the accuracy of the re-created records by comparing them to the originals, but that testimony was effectively impeached during voir dire by his deposition testimony that he did not recall seeing the original records from which the new document was produced.  (Tr. 99, 104.)  Second is the fact that the document reflects that plaintiff quit working for defendants around the start of

With no employer-preserved records, then, Yang can meet his burden by presenting sufficient evidence to generate a reasonable inference as to what he was actually paid by defendants.

Yang testified that he was paid weekly, and initially only in cash, but that on his request he was paid partially by cash and partially by check for a few months in 2002, after which he was once again paid wholly in cash. (Tr. 30.) According to Yang, he was hired in October 1997 at a wage of $200 per week. He worked elsewhere from January 1998 until December 1998 and was unemployed from January 1999 until he resumed working for defendants on July 18, 1999. Yang testified that from July 18, 1999 until February 2000, he was paid $350 per week; from February 2000 until the end of September 2000, he was paid $400 per week; from October 2000 until February 2001, he was paid $450 per week; from March 2001 until September 2001, he was paid $500 per week; from October 2001 until the end of March 2002, he was paid $550 per week; and from April 2002 until February 27, 2004, the end of his employment, he was paid $600 per week, except that he was not working for defendants from March 2003 until the beginning of September 2003. (Tr. 28-29.)[6] In addition, Yang testified that every holiday season he received an extra week's wages as a bonus (Tr. 30), but that he never received extra money when he worked on the weekends or other periods when he worked extended hours. (Tr. 23-24.)

---

April 2002 and did not resume his job at ACBL until the start of September 2002, yet plaintiff produced several paychecks made out to him from ACBL and signed by Lee for various weeks in June, July, and August 2002. (Pl. Ex. 2.) While the accuracy of a document not admitted into evidence is not of itself relevant to any issue in this case, Lee's lack of credibility on this issue casts considerable doubt on the balance of his testimony.

[6] Plaintiff provided a more detailed pay schedule in his submissions to the Court. According to these papers, from July 18, 1999 until February 6, 2000, Yang was paid $350 per week; from February 6, 2000 until October 1, 2000, he was paid $400 per week; from October 1, 2000 until March 4, 2001, he was paid $450 per week; from March 4, 2001 until November 4, 2001, he was paid $500 per week; from November 4, 2001 until March 31, 2002, he was paid $550 per week; and from March 31, 2002 until February 27, 2004, the end of his employment, he was paid $600 per week, excluding the period from March 2003 until the beginning of September 2003. See Am. App. 1 to Pl.'s Reply Mem. To Defs.' Contentions and Conclusions of Law. The only difference between plaintiff's testimony and his submissions to the Court is the date in 2001 that his wages increased from $500 to $550 per week; at trial, he said the change came at the beginning of October and the papers indicated that it happened at the start of November. The Court resolves this tension by adopting the date to which plaintiff testified, i.e., that plaintiff's wages increased in October.

The documentary and testimonial evidence largely corroborates Yang's testimony. For instance, Lee testified at trial that he hired Yang at a wage of about $250 per week (Tr. 77), a rate which essentially confirms Yang's testimony.[7] Lee then stated that he raised Yang's wages several times over the course of Yang's tenure.[8] Finally, Yang testified that for a few months in 2002, his $600 weekly wages were paid $300 in cash and $271 by check,[9] and he submitted photocopies of paychecks and bank statements from this period which support his testimony. (Pl. Exs. 2, 3). All of this evidence, coupled with Yang's generally credible demeanor and Lee's self-contradictory testimony, supports Yang's account of his wages. In sum, the Court holds that Yang has met his burden of presenting sufficient evidence from which his wages may be reasonably inferred.

Defendants attacked Yang's testimony regarding his wages in two principal ways. First, they endeavored to portray plaintiff's lawsuit as an attempt to take advantage of defendants' alleged loss of wage records in an office flood. The Court, it must be noted, is extremely skeptical that such records ever existed. However, even if records of plaintiff's wages did exist at one time, this attack fails to neutralize the inference arising from plaintiff's credible and corroborated testimony of his wages.

Second, defendants also attempted to cast doubt on plaintiff's testimony by submitting plaintiff's tax returns for 1999, 2000, and 2001, and plaintiff's son's tax returns for 2003 and 2004, on which plaintiff was claimed as a dependent. (Defs. Exs. I, J, K, L, M.) In 1999, for example, Yang reported only $1,854 in wages though he testified to working for defendants for six months of that year at a rate of $350 per week. When asked if his tax return was accurate,

---

[7] Although due to the statute of limitations Yang's wages in 1997 are not relevant to a lost wages calculation, the fact that Yang's recollection of his wages was corroborated by other evidence lends credibility to his testimony.

[8] At trial, Lee also asserted that the motivation behind raising Yang's wages was that from time to time Yang would threaten to quit unless his pay was increased. (Tr. 89-90.) However, regardless of whether Yang's raises were due to the fact of customary pay increases or to an employee-at-will's prerogative to condition future work on a pay raise, Lee's recollection of what he paid Yang generally supports Yang's testimony.

[9] The remaining $29 is the focus of plaintiff's conversion claim, treated *infra* Conclusions of Law, Part III.D.

Yang exercised his Fifth Amendment right and did not respond. (Tr. 46.) On his 2000 and 2001 returns, he left blank the line where wages and salary must be reported, and again took the Fifth Amendment when asked if the 2001 return was accurate. (Tr. 51.) When asked if he submitted a tax return for 2002 or for the years his son claimed him as a dependent, Yang also exercised his Fifth Amendment right. (Tr. 53-54.) While this evidence does cast some doubt on plaintiff's credibility, it does not "negative the reasonableness of the inference to be drawn from [Yang's] evidence." Mt. Clemens, 328 U.S. at 688. Having observed plaintiff's demeanor on the stand, the Court believes that while Yang may have filed false tax returns, his testimony concerning his wages was truthful.

Finally, the Court credits Yang's testimony that other than his Christmas bonus check, he received no additional payments other than the weekly payments described above, regardless of any additional hours he may have worked. (Tr. 23-24.) For instance, Yang testified that that there were only two periods covering a total of about six weeks where defendants used timecards to record his hours, and that at all other times no one kept track of his working time. (Tr. 36-37.) Lee, meanwhile, maintained that all of his employees punched timecards every morning and every evening. (Tr. 81.) The Court resolves this dispute in favor of plaintiff, because even assuming *arguendo* that years of timecards were destroyed in the January 2004 flood, defendants did not produce any timecards for the period plaintiff worked after the flood. If defendants had created and maintained such records as the law requires, their production would have been simple. With no evidence that defendants ever kept track of the precise hours plaintiff worked, the Court disbelieves the assertion that defendants calculated plaintiff's hours in excess of 40 and paid the required overtime premium.[10]

---

[10] The Court notes that defendants did not assert that plaintiff's weekly salary included an overtime premium. The rule here is that "[u]nless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime . . . ." Giles v. City of New York, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999). With no evidence that the parties agreed that the weekly salary would include hours paid

That said, although for purposes of the FLSA "[t]here is a rebuttable presumption that a weekly salary covers 40 hours," that presumption can be overcome by showing the existence of an "employer-employee agreement that the salary cover a different number of hours." Giles, 41 F. Supp. 2d at 317. In this case, the plaintiff concedes that there was an agreement that the salary cover 50 hours of work at plaintiff's regular hourly rate. See Pl.'s Pre-Trial Mem. of Law at 10 n.8. Although Lee testified that he paid Yang based on a 40 hour week (Tr. 77-78), considering both the fact of Lee's consistently inconsistent testimony, and the observation that it would have been more advantageous to plaintiff to leave the 40 hour presumption unrebutted in order to raise his regular rate of pay and possible overtime damages, the Court adopts plaintiff's concession and finds that the weekly wage was intended to cover 50 hours of straight-time pay.

In conclusion, the Court finds that defendants have failed to negate the reasonableness of the inference arising from plaintiff's evidence, and will adopt the wages to which plaintiff testified in calculating damages.

B. *Hours*

As with wages, it is also the employer's responsibility to create and maintain records of employee hours. See 29 U.S.C. § 211(c); 29 C.F.R. § 516.2; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6. However, as the Supreme Court has explained:

> [W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Mt. Clemens, 328 U.S. at 687-88.

---

at the overtime rate, the Court finds that the weekly wage paid plaintiff covered only hours paid at the regular rate.

Because defendants here did not produce admissible records of the hours plaintiff worked,[11] plaintiff must produce "sufficient evidence" to show the hours he worked "as a matter of just and reasonable inference." Id. Furthermore, it is possible for plaintiff to meet this burden by relying on his recollection alone. See, e.g., Mumbower v. Callicott, 526 F.2d 1183, 1186 (8th Cir. 1975) (relying on employee's recollection was proper, otherwise employers could "benefit from their failure" to maintain required records); Turner v. Human Genome Sciences, Inc., 292 F. Supp. 2d 738, 748 (D. Md. 2003) ("'A prima facie case can be made through an employee's testimony giving his recollection of hours worked . . . [and his case] is not to be dismissed nor should recovery for back pay be denied, because proof of the number of hours worked is inexact or not perfectly accurate.'") (quoting Donovan v. Kentwood Dev. Co., Inc., 549 F. Supp. 480, 485 (D. Md. 1982)).

At trial, Yang testified that he was scheduled to work from 9 a.m. until 7 p.m., Monday through Friday, but that he actually ended up having to stay later, until 7:30 or 8 p.m., nearly every day. (Tr. 20, 24.) He estimated that he left work at 7 p.m. only about 30 days per year. (Tr. 24.) As for weekends, Yang testified that he worked from 9 a.m. until 5 p.m. every other Saturday from the beginning of his employment through November 20, 1997, and again from July 1999 until November 1999. (Tr. 20-21.) In addition, Yang stated that he worked extended hours every year during the Christmas season and also for the month following the September 11, 2001 attacks. During the holiday season, which Yang estimated ran from November 20 to December 22 every year, Yang recalled working from 9 a.m. until 11 p.m., Monday through Friday, and from 9 a.m. until 7 p.m. on Saturdays and Sundays. (Tr. 21.) During the month following September 11, 2001, Yang testified that the company manufactured gold American flag badges, and that this change in production caused him to have to work from 9 a.m. until 10 p.m., Monday through Friday, and from 9 a.m. until 7 p.m. on Saturdays and Sundays. (Tr. 23.) Yang also

---

[11] See supra note 5.

stated that he took a lunch break every day for about a half-hour. (Tr. 67.) Finally, he testified that, due to trouble with a co-worker, he stopped working for defendants in March 2003 and resumed working for defendants in September 2003. (Tr. 19-20.)

Several parts of Yang's recollection of his hours were supported by Lee's testimony. For example, Lee also testified that the start of the workday was 9 a.m.[12] (Tr. 79.) He confirmed that his employees often worked overtime, particularly during the busy holiday season. (Tr. 79, 95.) Lee stated that his employees took a daily lunch break for about 45 minutes, and that it was fully compensated. (Tr. 81, 125.) In this way, through his recollection Yang has presented sufficient evidence to establish a reasonable inference as to the hours he worked.

Because defendants could not produce "evidence of the precise amount of work performed,"[13] Mt. Clemens, 328 U.S. at 687, their burden is to produce "evidence to negative the reasonableness of the inference" raised by plaintiff's recollection of his hours. Id. at 687-88. To this end, defendants concentrated on exposing as false Yang's testimony regarding his departure times. For instance, to counter Yang's testimony that he stayed at work later than the other employees (Tr. 24), the defense presented Yang with a November 2004 affidavit in another case in which Yang stated that all the Korean[14] workers at the factory worked the same hours. (Tr. 49.) However, on re-direct, Yang explained that while the other Korean employees were

---

[12] It should be noted here that Yang testified that he started work at 9 a.m., and that Lee generally did not arrive until 10:30 or 11:00. (Tr. 17.) Defendants attempted to impeach this testimony in two ways. First, they elicited from Yang on cross-examination that sometimes Lee drove Yang to work in the morning. (Tr. 67.) However, because there was no indication of how frequently this carpooling occurred, this admission does not necessarily indicate a significant inconsistency in Yang's testimony. Moreover, because Lee, as well, testified that the workday began at 9 a.m., a possible joint arrival is irrelevant to the determination of the hours plaintiff worked. Second, Lee testified that it was impossible for Yang to have started working before Lee arrived, because Lee kept the valuable metals in a safe and no employees had the key. (Tr. 79.) Later in his testimony, though, Lee stated that his manager, Hyung Park, could also open the safe. (Tr. 92.) Thus, Park could have opened the factory, enabling plaintiff to start work at 9 a.m., in advance of Lee. Furthermore, several of Yang's duties, such as making wax casts, did not require access to the metals and so could have been started before Lee's arrival.

[13] As discussed supra note 5, the Court determined that the alleged wage and hour records defendants attempted to introduce were inadmissible hearsay. In addition, Lee admitted during his testimony that he did not have a precise recollection of the hours Yang worked. (Tr. 113, 115.)

[14] Yang testified that of the company's approximately ten employees, at one time half were Korean and half were South American. (Tr. 37.)

scheduled to work the same hours, they did not actually work as many hours as he did. (Tr. 71.)

The Court credits this explanation, especially in light of the fact that after forcefully asserting on

direct examination that all of his employees, including Yang, left at the same time (Tr. 80), Lee

then stated, during voir dire by plaintiff's counsel, that his employees left at a variety of different

times and that he did not pay attention to their departure times. (Tr. 113.) In this way, defendants

failed to cast sufficient doubt on plaintiff's recollection of his hours to negative the inference

arising from his testimony,[15] and the Court will use those hours in determining damages owed

plaintiff.

## CONCLUSIONS OF LAW

### I. Statute of Limitations

A cause of action under the FLSA accrues on the regular payday immediately following

the work period for which services were rendered and not properly compensated. See Acosta v.

Yale Club of New York City, No. 94-CV-0888, 1995 WL 600873, at *3 (S.D.N.Y. Oct. 12,

1995). In general, the statute of limitations for bringing an FLSA suit is two years from the date

the cause of action accrued. 29 U.S.C. § 255(a). In the case of a "willful violation," however, the

statute of limitations is extended to three years. Id. Yang asserts that the defendants' FLSA

violations here were willful.

The Supreme Court has instructed that a violation is willful if the "employer either knew

or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). The Court agrees with plaintiff

that defendants' violation was willful. Lee repeatedly stated that he knew that he was required to

---

[15] As stated supra note 3, in the absence of adequate records, New York law places the burden on the
employer to show the employee was properly compensated. See N.Y. Lab. L. § 196-a. Because the
employer here, though, could not even satisfy the burden under the FLSA to "negative the reasonableness
of the inference" arising from the employee's evidence of his hours and wages, Mt. Clemens, 328 U.S. at
688, then a fortiori he could not satisfy the more demanding burden of showing by a preponderance of the
evidence that plaintiff was properly paid for the hours he worked. Thus, the finding of FLSA liability here
necessarily implies a finding of liability under New York law.

pay the overtime premium for all hours worked in excess of 40 per week. (Tr. 77-78, 81.) Despite Lee's knowledge of the law's requirement that employees be paid an overtime premium, though, as discussed in the Court's findings of fact, Yang's weekly wages did not include such a premium and Yang received no additional payments except a bonus during the holiday season. Plainly, Lee knew what the law required of him, and he chose to disregard it. Such conduct defines a willful violation, and the Court will apply the FLSA's three-year statute of limitations. Defendants are thus liable under the FLSA for violations that accrued during the three years that preceded the filing of the complaint on November 15, 2004.

The statute of limitations for violations of New York's overtime and spread of hours requirements is six years. See N.Y. Lab. L. §§ 198(3), 663(3). Accordingly, defendants are liable under New York law for violations that accrued during the six years that preceded the filing of the complaint on November 15, 2004.

II. "Regular Rate" of Employment

Both the FLSA and New York law require employers to compensate each employee at a premium rate, based on the particular employee's "regular rate," for hours worked in excess of 40 per week. See 29 U.S.C. § 207(a)(1) (covered employers must pay covered employees "at a rate not less than one and one-half times the regular rate" for hours in excess of 40); N.Y. Comp. Codes R. & Regs. tit. 12, § 138-2.2 (employers must pay nonresidential employees "at a wage rate of 1 ½ times the employee's regular rate for hours worked in excess of" 40). In order to calculate overtime damages due to plaintiff, then, it is necessary to determine plaintiff's "regular rate" of pay for the relevant periods. The regular rate is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed," Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945), and is calculated by "dividing the employee's weekly compensation by the number of hours for which that compensation is

intended." Moon v. Kwon, 248 F. Supp. 2d 201, 230 (S.D.N.Y. 2002); see also 29 C.F.R. §
778.109; 29 C.F.R. § 778.113(a).

Applying this formula to the Court's finding that plaintiff's weekly compensation was
intended to cover a 50-hour workweek, plaintiff's total weekly compensation, regular rate of pay,
and overtime rate for the relevant periods are as follows:

| Weeks Beginning | Weekly Wages | Regular Rate | Overtime Rate |
|---|---|---|---|
| 7/18/99 – 1/30/00 | $350 | $7 | $10.50 |
| 2/6/00 – 9/24/00 | $400 | $8 | $12 |
| 10/1/00 – 2/25/01 | $450 | $9 | $13.50 |
| 3/4/01 – 9/30/01 | $500 | $10 | $15 |
| 10/7/01 – 3/24/02 | $550 | $11 | $16.5 |
| 3/31/02 – 2/22/04 | $600 | $12 | $18 |

III.  Calculation of Damages

A.  *Overtime Compensation*

As discussed above, the Court has found, "as a matter of just and reasonable inference"
from the evidence, Mt. Clemens, 328 U.S. at 687, that during a typical week, Yang worked 52.5
hours, yielding 12.5 hours per week to be compensated at the overtime rate.[16]  In addition, he is
due overtime compensation for the extended hours he worked during the holiday season in the
years 1999 through 2003.  Finally, he is entitled to overtime compensation for the extra hours he
worked in the month following September 11, 2001.  Based on the overtime rates calculated
above, the raw total of damages owed plaintiff for unpaid overtime under the FLSA and New
York law is $34,482.50, as set forth in Appendix A of this Memorandum and Order.  However,
because Yang testified that he left work at 7 p.m. approximately 30 days per year,[17] the Court

---

[16] In the findings of fact it was recounted that Yang testified to working until 7:30 or 8 p.m. on most days,
even though he was only scheduled to work from 9 a.m. until 7 p.m.  The Court has calculated damages
using 7:30 as his departure time.

[17] Although this figure is inexact and possibly overinclusive, the Second Circuit has instructed that when
choosing between an overinclusive estimate by an employee and an underinclusive one by an employer, it
is not unreasonable for a district court to adopt the employee's estimate, for "consistent with the lesson of
Mt. Clemens . . . [this] place[s] the burden of inadequate record keeping on the employer."  S. New
England Telecomms., 121 F.3d at 70.

subtracts $930.75[18] from the raw total, and arrives at $33,551.75 in overtime damages due plaintiff.

## B.  *Spread of Hours*

New York law provides that covered employees, such as plaintiff, are entitled to an additional hour's pay at the basic minimum hourly wage rate for any day in which "the spread of hours"—defined as "the interval between the beginning and end of an employee's workday," N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.18—exceeds 10 hours.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4.  As displayed in Appendix A, the Court finds that there were a substantial number of days in which plaintiff worked in excess of 10 hours.

As to the amount of damages due, however, defendants ask the Court to consider a private party opinion letter by the New York Department of Labor which states that if the weekly wages actually paid to an employee equal or exceed the total of: (i) 40 hours paid at the basic minimum wage rate;  (ii) overtime paid at the particular employee's overtime rate;  and (iii) one hour's basic minimum wage rate for each day the employee worked in excess of 10 hours, then no additional compensation is due.  See Defs.' Contentions and Conclusions of Law ¶¶ 42-45.  Defendants argue that the Court should defer to this opinion letter because "when applying its special expertise in a particular field to interpret statutory language, an agency's rational construction is entitled to deference."  Raritan Dev. Corp. v. Silva, 91 N.Y.2d 98, 102 (N.Y. 1997).

However, when reviewing agency determinations, New York courts have ruled that there are, in fact, two standards of review.  While courts defer to the governmental agency which administers the statute when the matter "involves knowledge and understanding of underlying

---

[18] Because Yang worked for defendants for only half of the year in both 1999 and 2003, and for only two months in 2004, the Court pro-rated the 30 day estimate for those years, to find that plaintiff left at 7 p.m. 15 days in 1999, 30 days in each of 2000, 2001, and 2002, 15 days in 2003, and 5 days in 2004. Accordingly, the Court subtracted 7.5 hours of overtime pay for 1999 ($78.75), 15 hours for 2000 ($180), 2001 ($225), and 2002 ($270), 7.5 hours for 2003 ($132), and 2.5 hours for 2004 ($45).

operational practices or entails an evaluation of factual data and inferences to be drawn therefrom," Kurcsics v. Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459 (N.Y. 1980), deference is not required when "the question is one of pure legal interpretation of statutory terms." Toys "R" Us v. Silva, 89 N.Y.2d 411, 419 (N.Y. 1996).

Assuming *arguendo* that this private party opinion letter is the sort of agency determination to which a court should defer in any instance, the Court concludes that deference is not required here. The effect of adopting the agency's interpretation would be to carve out an exception to the spread of hours provision for workers who are properly paid overtime and make more than the minimum wage. As this is a question of legal interpretation, deference is not required. Defendants do not offer any argument that the regulation's language itself dictates this exception, and the Court sees none. As such, defendants' proffered interpretation is rejected, and the Court concludes that plaintiff is due spread of hours compensation totaling $4,693.15.[19]

## C. *Liquidated Damages*

### i. Federal

Under the FLSA, an employer who violates the statute's overtime compensation provision is liable for any unpaid overtime compensation and "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Nevertheless, the Court has discretion to reduce or deny this additional penalty "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The employer's burden, though, is a "difficult one to meet, . . . and '[d]ouble damages are the norm, single damages the exception.'" S. New England Telecomms., 121 F.3d at 71 (quoting Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987)).

---

[19] As with overtime damages, the Court here as well accounted for the estimated 30 days per year in which plaintiff left at 7 p.m. by subtracting from Appendix A's raw total 15 days of spread of hours damages for 1999 ($63.75), 30 days for 2000 ($154.50), 2001 ($154.50), and 2002 ($154.50), 15 days for 2003 ($77.25), and 5 days for 2004 ($25.75).

Here, the Court does not find defendants' FLSA violations to have been in good faith. Despite defendants' protestations that they kept payment records, the Court does not believe that defendants made any effort to comply with the FLSA's record-keeping requirements. Furthermore, Lee admitted that he did not pay Social Security for Yang. (Tr. 82.) Though Yang worked in excess of 40 hours per week for defendants for several years, he was never paid overtime, despite federal and state requirements. Such conduct, considered as a whole, demonstrates not a good faith effort to comply with the FLSA's requirements, but instead a complete disregard for them. Yang is thus entitled to a liquidated damages award of $17,674.03, representing 100 percent of the total overtime wages owed between November 15, 2001 and November 15, 2004.[20]

ii. State

Under the New York Labor Law, an employee may be awarded liquidated damages equal to twenty-five percent of the total wages due if the Court finds that the employer's failure to pay the required wages was "willful." N.Y. Lab. L. § 198(1-a). A failure to pay is "willful" when the employer "'knowingly, deliberately, or voluntarily' disregards its obligation to pay wages." Ayres v. 127 Restaurant Corp., 12 F. Supp. 2d 305, 309 (S.D.N.Y. 1998) (quoting P & L Group, Inc. v. Garfinkel, 541 N.Y.S.2d 535, 537 (2d Dep't 1989)). Proof that the defendants acted maliciously or in bad faith is not necessary. Id. at 309.

In the above discussion of the applicability of the FLSA's extended statute of limitations, the Court determined that defendants' FLSA violations were willful. "Since the standard for willfulness for purposes of the FLSA statute of limitations does not appreciably differ from the standard applicable under New York law when determining whether to award liquidated damages," Moon, 248 F. Supp. 2d at 235, the Court finds that Yang is entitled to a liquidated

_____

[20] The unadjusted uncompensated overtime for this period is $18,151.32. The Court subtracted from this raw total the excess overtime for the years 2002 through 2004, as explained supra note 18, and 7/52 of the overtime calculated in that note for 2001 because FLSA claims accrued during only seven weeks of 2001.

damages award of $4,620.04, representing 25 percent of the total wages and spread of hours pay owed between July 18, 1999 and November 15, 2001.[21]

### D. *Conversion*

Yang also brings a claim for conversion. Under New York law, a plaintiff stating a claim for conversion must show that he "had legal title or an immediate superior right of possession to [an] identifiable fund and the exercise by defendants of unauthorized dominion over the money in question to the exclusion of plaintiff's rights." Bankers Trust Co. v. Cerrato, Sweeney, Cohn, Stahl & Vaccaro, 590 N.Y.S.2d 201, 202 (1st Dep't 1992).

Yang claims that defendants committed the tort of conversion by retaining deductions from his paychecks. He contends that for the period his $600 weekly wages were to be paid in both cash and check, he received $300 in cash each week, but only $271 of the remaining $300 by check. He asserts that defendants did not use the remaining money to pay taxes nor did they return it to him.

Here, there is an identifiable fund because Yang is claiming conversion of $29 deducted from each of twelve paychecks. See Pl. Ex. 2. Further, Yang had "an immediate superior right of possession" to this fund because the deductions were made from his wages; before he requested to be paid in both cash and check, for instance, he received the entire $600 of his wages, thus demonstrating even defendants' acknowledgement of his right to their possession. Finally, the Court credits plaintiff's testimony that no taxes were paid on his behalf and that he was never reimbursed for these deductions from his paychecks. (Tr. 34-36.) Therefore, because defendants exercised unauthorized dominion over this money by withholding this portion of his wages, plaintiff is entitled to $348 in damages.

---

[21] The overtime damages for this period, after adjusting for the pro-rated number of days plaintiff left work at 7 p.m., are $15,877.72. The adjusted spread of hours damages for this period are $2,602.45, arrived at by subtracting from the raw spread of hours figure for this period, $2,954.40, the deducted spread of hours damages as explained supra note 19 for the years 1999 and 2000, and 45/52 of $154.50, the spread of hours deduction for the portion of 2001 falling before November 15. The combined figure was $18,480.17, yielding a liquidated damages total of $4,620.04.

Furthermore, punitive damages "may be recovered for an act of conversion where the circumstances establish that the conversion was accomplished by malice or reckless or willful disregard of the plaintiff's right." Ashare v. Mirkin, Barre, Saltzstein, & Gordon P.C., 435 N.Y.S.2d 438, 441 (N.Y. Sup. 1980). Punitive damages "should bear some reasonable relation to the harm done and the flagrancy of the conduct causing it." I.H.P. Corp. v. 210 Cent. Park S. Corp., 228 N.Y.S.2d 883, 889 (1st Dep't 1962). Since the conversion in this case resembles an improper deduction as defined by New York state law and such a violation carries a liquidated damages penalty of 25 percent, the Court awards plaintiff punitive damages equal to 25 percent of the conversion damages, or $87. See N.Y. Lab. L. §§ 193, 198(1-a); see also I.H.P. Corp., 228 N.Y.S.2d at 889 (awarding treble punitive damages because a statutory damages provision also assessed treble damages for a similar violation, and thus was "an appropriate analogue").

E.  *Interest on Overtime, Spread of Hours, and Conversion Damages*

Plaintiff also seeks prejudgment interest on his state law claims pursuant to N.Y. C.P.L.R. § 5001. Because the "damages were incurred at various times," plaintiff used the midpoint of the accrual of each of the three sets of damages to calculate interest. N.Y. C.P.L.R. § 5001(b); see also Liu v. Jen Chu Fashion Corp., No. 00 Civ. 4421, 2004 WL 33412, at *5 (S.D.N.Y. Jan. 7, 2004). He also employed the statutory 9% interest rate. See N.Y. C.P.L.R. § 5004. The Court accepts this methodology, and finds that plaintiff is entitled to interest on his overtime damages from July 18, 1999 until November 15, 2001 in the amount of $8,176.01;[22] interest on his spread of hours damages from July 18, 1999 until February 27, 2004 in the amount of $1685.31;[23] and interest on his conversion damages in the amount of $125.28.[24]

---

[22] The midpoint date for the overtime claim was September 12, 2000, generating 5.14 years of interest.
[23] The midpoint date for the spread of hours claim was November 3, 2001, generating 3.99 years of interest.
[24] The conversion claim began on June 21, 2002 and ended on October 21, 2002, yielding a midpoint date of August 21, 2002, and generating 3.20 years of interest.

IV.  Joint and Several Liability of Lee

To be liable under the FLSA, one must be an "employer," which the statute broadly defines as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  The definition of "employer" is similarly expansive under New York law, encompassing any "person employing any [employee]."  N.Y. Lab. L. § 2(6).  See also N.Y. Lab. L. § 651(6).  The central inquiry in determining whether one qualifies as an "employer" under these generous definitions is "whether the alleged employer possessed the power to control the workers in question, . . . with an eye to the 'economic reality' presented by the facts of each case."  Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (quoting Goldberg v. Whitaker House Coop., 366 U.S. 28, 33 (1961)).[25]  Factors to consider when examining the "economic reality" of a particular situation include "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records,'" though no single factor is dispositive.  Id. (quoting Carter v. Dutchess Comm. Coll., 735 F.2d 8, 12 (2d Cir. 1984)).

Here, the facts demonstrate quite clearly that Lee was Yang's employer.  The parties stipulated that Lee was the president and sole owner of Gold Lee and is currently the president and sole owner of ACBL.  Stip. of Facts # 2, 4.  They further stipulated that in that position, Lee had the power to hire and fire Yang and set Yang's work schedule and wages, that he ran the day-to-day activities of the business, and that no other employee had such powers.  Id. # 9, 16.  Keeping in mind that "'[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages,'" Moon, 248 F. Supp.

---

[25] The "economic reality" test will be used to determine whether Lee is Yang's "employer" as defined under both state and federal law, as "[t]here is general support for giving FLSA and the New York Labor Law consistent interpretations."  Topo v. Dhir, No. 01 Civ. 10881, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004).

2d at 237 (quoting Donvan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983)), the Court holds that Lee was Yang's employer under federal and state law, and thus is jointly and severally liable, along with Gold Lee and ACBL, for the damages arising from the above-discussed violations.

## CONCLUSION

For the foregoing reasons, the Court concludes that Yang has proven, by a preponderance of the evidence, that defendants violated the FLSA and the New York Labor Law by failing to pay him overtime and spread of hours wages, and that they also committed the tort of conversion. Accordingly, the Court awards Yang damages totaling $70,960.57, for which the defendants are joint and severally liable.

The FLSA provides for the defendant to pay a successful plaintiff's attorneys' fees and costs. 29 U.S.C. § 216(b). Plaintiff requests such payment, but has not yet submitted an estimate to the Court. Plaintiff shall submit such an application by January 18, 2006, and defendants shall submit any opposition by February 8, 2006.

SO ORDERED.

Dated: New York, New York
December 5, 2005

Gerard D. Sand
U.S.D.J.

19